RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0219p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

KATHLEEN C. BENISON and CHRISTOPHER BENISON,

*Plaintiffs-Appellants,*

v.

No. 13-2554

GEORGE ROSS, President of Central Michigan University, in his individual and official capacity, E. GARY SHAPIRO, Executive Vice President and Provost, in his individual capacity, and IAN R. DAVISON, Dean, College of Science and Technology, in his individual capacity,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:12-cv-15226—Thomas L. Ludington, District Judge.

Argued: August 8, 2014

Decided and Filed: September 3, 2014

Before: MOORE, SUTTON, and ALARCÓN, Circuit Judges.[*]

———————

## COUNSEL

**ARGUED:** Bradley K. Glazier, BOS & GLAZIER, P.L.C., Grand Rapids, Michigan, for Appellants. Ryan K. Kauffman, FRASER, TREBILCOCK, DAVIS & DUNLAP, P.C., Lansing, Michigan, for Appellees. **ON BRIEF:** Bradley K. Glazier, BOS & GLAZIER, P.L.C., Grand Rapids, Michigan, for Appellants. Ryan K. Kauffman, Michael E. Cavanaugh, FRASER, TREBILCOCK, DAVIS & DUNLAP, P.C., Lansing, Michigan, for Appellees.

———————

[*]The Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

1

MOORE, J., delivered the opinion of the court, in which SUTTON, J., joined. ALARCÓN, J. (pp. 20–21), delivered a separate dissenting opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Kathleen Benison was a tenured professor of geology at Central Michigan University ("CMU").  In 2011, Kathleen's husband Christopher Benison, an undergraduate student at CMU, sponsored a vote of no confidence in the president and provost of the university.  Shortly after the vote, in accordance with the collective bargaining agreement negotiated by the CMU faculty, Kathleen took a semester of sabbatical leave for Spring 2012.  She agreed that, as a condition of her leave, she would return to CMU for at least one full year following sabbatical or return any compensation received during her leave.  While Kathleen was on sabbatical, she became eligible for and requested a promotional pay supplement.  Kathleen's department recommended denying her application for a salary supplement, and the reviewing dean agreed.  Kathleen appealed their recommendations to the provost, but she resigned before he could render a final decision.  Pursuant to the sabbatical agreement, CMU requested that Kathleen return any compensation she received during her sabbatical semester, including salary and benefits.  When Kathleen refused, the university filed a lawsuit in state court based on breach of contract.  Because Christopher's tuition had been remitted for the Spring 2012 semester as part of Kathleen's benefits and Kathleen was contractually obligated to repay her salary and benefits for the semester, CMU determined that Christopher had an outstanding tuition balance and placed a hold on his academic transcript.

The Benisons filed suit in federal court alleging that the president of CMU, in his individual and official capacities, and the provost and dean, in their individual capacities only, retaliated against them because of Christopher's sponsorship of the no-confidence resolution against the provost and the president.  We find sufficient evidence to create a genuine dispute of material fact regarding whether CMU filed a lawsuit against Kathleen Benison and placed a hold on Christopher Benison's transcript in retaliation for Christopher's exercise of his First Amendment rights.  We also conclude that CMU, as represented by President Ross in his official

capacity, cannot shield itself from liability by invoking qualified immunity. Therefore, we **AFFIRM** in part and **REVERSE** in part the judgment of the district court and **REMAND** for further proceedings.

## I. BACKGROUND

In 1997, Central Michigan University hired Dr. Kathleen Benison as an assistant professor of geology. Over the next fourteen years of her employment at CMU, Kathleen received five reappointments and three promotions. During each of the eight assessments, she received only positive recommendations from the other members of her department, the Earth and Atmospheric Sciences Department (the "EAS Department" or "Department"). Kathleen also received recognition for her outstanding research and teaching record during her time at CMU. In 2008, Kathleen was granted tenure as a full professor.

In September 2010, Kathleen requested permission to take sabbatical leave during the Spring 2012 semester. On December 7, Provost E. Gary Shapiro sent Kathleen a letter detailing her obligations while on sabbatical. The letter stated that one of those obligations was "[t]o return to CMU for at least one academic year following the leave or to refund the salary and benefits paid by CMU during the leave." R. 20-2 (Sabbatical Ltr.) (Page ID #728). On January 13, 2011, Kathleen signed a sabbatical contract including the following term: "I agree to return to the University in my regular assignment for one full contractual period following the termination of my leave or to refund the compensation paid to me by CMU for the period of my leave." R. 20-2 (Sabbatical Agreement) (Page ID #738).[1]

In the Fall 2011 semester, Kathleen requested to be relieved from teaching assignments so that she could focus on her research. CMU granted Kathleen a release from teaching obligations, but she remained obligated to fulfill the other duties of her position, including her service duties. Sven Morgan, the Chair of the EAS Department, felt that Kathleen was not fulfilling her service obligations during the semester based on at least two incidents. On one

---

[1]The faculty's collective bargaining agreement ("Faculty Agreement") also states that a faculty member is obligated to return following a sabbatical, and clarifies that there is a duty to "refund the compensation paid by CMU during the leave unless this obligation is specifically waived by the Provost." R. 20-2 (Faculty Agreement at 59) (Page ID #714). Such a waiver is automatic "in case of death, accident, or illness causing the bargaining unit member to be unable to return." *Id.*

occasion, Morgan assumed the credit for completing a department prioritization project that Kathleen claims she had completed with another professor. On another occasion, Kathleen inquired about missing a department retreat because she had already scheduled a meeting and site visit with grant collaborators. Morgan replied that her question was "frustrating" and that missing such meetings was akin to avoiding service. R. 20-4 (Retreat Email) (Page ID #850). This was not the first time that Morgan had found Kathleen's service to the department lacking: In 2010, when Morgan asked Kathleen to complete an assessment for the Department, she explained that she could not complete the assessment by the deadline because she was overburdened with commitments. Morgan interpreted her response as a refusal and warned her that "he would vote [her] down for future promotion" because she was not providing enough service to the Department. R. 20-4 (Benison Dep. at 174) (Page ID #819). After Morgan complained to the Dean of the College of Science and Technology, Ian R. Davison, that Kathleen was shirking her responsibilities, Dean Davison sent Kathleen an email dated August 11, 2011 reminding her of her service obligations.

In December 2011, Kathleen's husband Christopher Benison, who was then an undergraduate student at CMU, sponsored a resolution of no confidence in Provost Shapiro and CMU President George Ross. The Academic Senate, which is composed of students, administrators, and faculty members, passed the resolution on December 6, 2011. The no-confidence resolution was widely endorsed by CMU's academic departments and chairs, but the CMU Board of Trustees, of which Dean Davison is a member, drafted a letter in support of Ross and Shapiro. After the vote, Leigh Orf, a member of the EAS Department, mentioned the Benisons when discussing his opposition to the resolution with other faculty members. On several occasions, Kathleen overheard him say, during conversations regarding the Benisons' support of the resolution, "that he was going to teach [Kathleen] a lesson when it came time for [her] promotion." R. 20-4 (Benison Dep. at 39) (Page ID #813).

In Spring 2012, Kathleen began her semester of sabbatical leave. She also became eligible for a promotional pay increase, and on January 16, 2012, she submitted an application setting forth her qualifications for the promotion. The Faculty Agreement provides for a three-step review process of applications for promotion: First, the faculty member's department makes

a recommendation based on "the extent to which departmental members have fulfilled the criteria and standards established in compliance with this Agreement."  R. 20-2 (Faculty Agreement at 32) (Page ID #707).  Second, the Department forwards its recommendation to the dean, who "considers the recommendations and renders an independent judgment on the bargaining unit member's achievements as indicated by the documentation, giving due weight to the department's recommendation including the rationale and documentation." *Id.* at 33.  After the dean makes a recommendation, a faculty member may "initiate a request for review by the Provost." *Id.* at 34.  In that case, the dean's recommendation is forwarded to the provost, who "considers the recommendations and, following consultation with the President, renders an independent judgment on the bargaining unit member's achievements as indicated by the documentation, giving due weight to the department's recommendation including the rationale and documentation." *Id.*  The faculty member may then request a meeting with the provost to address any errors.  In the event of a negative recommendation from the provost, the faculty member may utilize an internal grievance procedure to appeal the decision.

Upon receipt of Kathleen's application, the EAS Department considered her materials and voted not to recommend her for a salary adjustment.  Although all nine faculty members recognized her accomplishments in "teaching competence" and "scholarly and creative activity," eight members found her "service to the Department . . . lacking."  R. 20-3 (Department Rec. at 1) (Page ID #797).  They explained:

> Dr. Benison does demonstrate leadership to her profession but she does not contribute high quality leadership to Department service activities.  The Department view is that Dr. Benison does contribute to service activities but these are mostly short-term, time limited commitments.

*Id.*  The dissenting member noted Dr. Benison's service to CMU, including several examples of "leadership at the Department level." *Id.*  The Department Chair, Dr. Sven Morgan, added his own comments, explaining:

> Dr. Benison is an excellent teacher and researcher but she has not contributed leadership to Department service activities.  In fact, her actions have led to a negative morale in the department because junior faculty members have to do extra service activities to make up for the lack of service by our full professors.
>
> . . .

> The EAS Department has only three full professors and each one must take on leadership in department service duties—the long-term, time consuming service duties—for the department to function effectively and to allow every faculty member the time to conduct research.

*Id.* at 2 (Page ID #798).

When Kathleen protested to Morgan that her service was adequate to support a promotion, he warned her: "Don't bother filing an appeal because the dean will only go along with me." R. 20-4 (Benison Dep. at 390) (Page ID #826). Kathleen interpreted this comment as an indication that "there was already a plan that the administration was using the department for this." *Id.* Kathleen believed that Morgan's interpretation of her service was "just a part" of his negative vote, and that he also voted to deny her application because "he tended to agree with Leigh Orf" regarding the no-confidence resolution. R. 20-4 (Benison Dep. at 177) (Page ID #819). Roger Hatch, a long-time Faculty Association official, testified "that there has never been a case during [his] 37 years at CMU where someone was denied a promotion on the basis of service alone." R. 20-3 (Hatch Dep. at 37) (Page ID #753). Therefore, he thought "that something unusual was going on at the department level and that seemed then to be ratified by the dean without much thought." *Id.* at 39 (Page ID #754).

After the EAS Department made its negative recommendation, Kathleen's materials were forwarded to Dean Davison as the reviewing dean. While Kathleen's application was pending before him, Dean Davison began circulating emails documenting Morgan's past frustrations with Kathleen's service to Morgan, Provost Shapiro, and Matt Serra, another administrator. On April 2, 2012, the Monday following the deadline provided for by the Faculty Agreement, Dean Davison issued his negative recommendation on Kathleen's application for a salary supplement. Davison explained:

> Despite the representations made by Dr. Benison's advocate . . . and Dr. Benison's long rebuttal to the departmental recommendation (which is in my opinion consistent with the department's criticism regarding an avoidance of onerous but critical service), I find no compelling evidence to support overturning the negative recommendation of the department and the chairperson. . . . Furthermore, I have had occasion to remind Dr. Benison that receiving reassigned time for research does not obviate her service obligations.

R. 20-4 (Dean Rec. at 3) (Page ID #843).  Kathleen requested a meeting to address Davison's recommendation.  Dean Davison agreed to meet with Kathleen and her advocate, but he was "brusk" and "did not seem to be very familiar with [the record]."  R. 20-3 (Hatch Dep. at 107, 125) (Page ID #757–58).  After the meeting, Dean Davison issued a modified recommendation expanding on his explanation that Kathleen's service record did not support a salary promotion.  R. 20-4 (Dean Modified Rec. at 4) (Page ID #848).

When Dean Davison issued his negative recommendation, Kathleen began to "very seriously recognize that [she] was being forced out [and that she] was never going to be treated fairly at CMU again."  R. 20-4 (Benison Dep. at 110) (Page ID #817).  Nonetheless, she requested that Provost Shapiro review her application.  Kathleen also began to submit applications for positions with several other universities at the same time she sought review of her application, and on May 15, 2012 she received an offer to join the faculty of West Virginia University ("WVU") as an associate professor.  On May 21, Provost Shapiro was notified that Christopher "has publicly stated that [the Benisons] are moving to Morgantown WV where Kath[leen] has taken a position at WVU," R. 20-4 (Relocation Email) (Page ID #857), and on May 29, Shapiro learned that the Benisons had sold their house in Michigan, to which he responded that "[t]he news just gets better and better."  *Id.* (Page ID #856).  In late May, Kathleen verbally accepted WVU's employment offer, but she did not officially resign her position with CMU until June 6, 2012.  At that point, Provost Shapiro had not yet issued a final decision on her application for a promotional salary supplement.

After Kathleen resigned, CMU demanded that she pay back her "total compensation (salary and benefits)" from the Spring 2012 semester because she had breached her obligation to return for one year following a sabbatical.  R. 20-4 (Compensation Ltr.) (Page ID #879).  When Kathleen refused, CMU filed suit in state court seeking to recover all compensation, including the value of Christopher's tuition for the Spring 2012 semester, which had been remitted because he was a family member of a university employee.  CMU also placed a hold on Christopher's academic transcript because, without the benefit of the tuition remission, he had an outstanding tuition balance for the Spring 2012 semester.

On November 28, 2012, the Benisons filed suit in federal court pursuant to 42 U.S.C. § 1983, alleging that President Ross, Provost Shapiro, and Dean Davison (collectively, "CMU" or the "Defendants") had retaliated against them for the exercise of their First Amendment rights. On the Defendants' motion, the district court granted summary judgment. R. 26 (D. Ct. Op.) (Page ID #961–88). The district court first recognized that Christopher's "motion for a no confidence vote in the Academic Senate is constitutionally protected speech" and that Kathleen "may maintain a third-party retaliation claim on the basis of her husband's protected activity." *Id.* at 8–9 (Page ID #968–69). The district court then addressed individually each of the adverse actions identified by the Benisons. First, the district court concluded that the EAS Department's negative vote on her salary supplement application was an adverse action and that the Benisons had provided evidence raising an inference that the decision was motivated by retaliatory animus; however, the district court concluded that the Benisons could not refute the Defendants' non-retaliatory justification related to Kathleen's alleged lack of service. *Id.* at 11–13 (Page ID #971–73). Second, the district court determined that the filing of a lawsuit to recover Kathleen's sabbatical compensation was an adverse action, but concluded that the Benisons had not produced any evidence that the filing of the lawsuit was motivated by Christopher's protected speech. The district court reasoned that CMU filed the lawsuit too long after the no-confidence vote to provide strong evidence of causation, and that there was no evidence that Kathleen was treated differently from comparable professors who failed to return following a sabbatical. *Id.* at 17–21 (Page ID #977–81). Finally, the district court turned to Christopher's claim and concluded that, although the transcript hold was an adverse action, there was no evidence indicating that the hold was motivated by his protected conduct. *Id.* at 26. The Benisons filed this timely appeal.

## II.  STANDARD OF REVIEW

We review de novo a district court's order granting a motion for summary judgment. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399 (6th Cir. 2010). In doing so, we must consider the record and draw any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper only if the moving party shows that the record does not reveal a

"genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Therefore we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III. FIRST AMENDMENT RETALIATION

The Benisons argue that the Defendants retaliated against them by denying Kathleen a promotional pay supplement, filing suit against her in state court, and placing a hold on Christopher's transcript as punishment for Christopher's sponsorship of the no-confidence resolution against President Ross and Provost Shapiro. We use a burden-shifting framework to determine whether a plaintiff has adequately proven a claim of First Amendment retaliation:

> A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct. If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012) (internal citations and quotation marks omitted); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Accordingly, we will first consider whether the Benisons have provided sufficient evidence to create a genuine dispute of material fact regarding whether any of the actions taken against them were motivated by their constitutionally protected conduct. If the Benisons can point to evidence supporting all three elements of a prima facie case, we will next consider whether CMU can demonstrate that it would have taken the same action regardless of the Benisons' protected conduct, such that it was entitled to summary judgment.

### A. Prima Facie Case

The Benisons argue that CMU retaliated against them for Christopher's involvement in passing a no-confidence resolution against President Ross and Provost Shapiro. CMU does not dispute that Christopher's sponsorship of the no-confidence resolution against President Ross and Provost Shapiro was constitutionally protected speech, *see Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), or that Kathleen may assert a retaliation claim stemming from her association with Christopher and his protected speech. *See Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011). Therefore, the central issues on this appeal are whether the Defendants took an adverse action against either of the Benisons and whether any such adverse action is causally connected to Christopher's sponsorship of the no-confidence resolution.

The Benisons argue that CMU took three adverse actions against them in retaliation for their support of the no-confidence resolution: (1) the denial of a promotional pay supplement for Kathleen, (2) the filing of a lawsuit in state court to recover compensation paid to Kathleen while she was on sabbatical, and (3) the placement of a hold on Christopher's transcript. To demonstrate that he has suffered an adverse action, a plaintiff must show that the action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Ctr. For Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (internal quotation marks omitted); *see also Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006). This standard is "distinct" from the adverse-action standard used in traditional employment discrimination claims, and thus we must "tailor our analysis under the adverse action prong to the circumstances of this specific retaliation claim." *Dye*, 702 F.3d at 303–04 (internal quotation marks omitted). We will consider each alleged adverse action in turn to determine whether the Benisons have produced evidence from which a reasonable jury could conclude that the action "might have dissuaded a reasonable worker from" engaging in protected activity. *Burlington*, 548 U.S. at 68 (internal quotation marks omitted).

The negative recommendations of the EAS Department and Dean Davison regarding Kathleen's application for a promotional pay supplement are not adverse actions because Kathleen resigned before CMU made a final decision to deny her request for a salary increase. Tenure decisions and other promotional "decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally." *Dobbs-Weinstein*

*v. Vanderbilt Univ.*, 185 F.3d 542, 545 (6th Cir. 1999) (internal quotation marks omitted).  In *Dobbs-Weinstein*, we held that a dean's decision to deny tenure to a professor was not an adverse action because it was not an "ultimate employment decision":

> Because tenure decisions are so complex and potentially contentious, universities are well-served to have a grievance procedure for individuals wishing to appeal any of the many intermediate decisions or evaluations made during the tenure review process.  [When a university] employs such a process, [it] allow[s] [a professor] to prevent [a negative] interim decision from becoming final.

*Id.* at 545; *see also Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) ("[A] university should have the opportunity to correct errors through its complete internal appeals process that precedes its final decision."); *Howze v. Va. Polytechnic & State Univ.*, 901 F. Supp. 1091, 1097 (W.D. Va. 1995) ("[W]here the tenure decision was following the chain of appeal, each decision along the way is not actionable.  Only the final decision is the ultimate act.").  The same principle is applicable to "[i]ntermediate decisions in a promotion process [which] do not constitute independent adverse employment actions unless they directly influence the decision-maker's choice [to deny promotion.]" *Okruhlik*, 395 F.3d at 879–80.

The recommendations of the EAS Department and Dean Davison are non-binding "intermediate decisions," and thus they are not adverse actions.  At the point that Kathleen resigned, she still had available to her several layers of internal review:  the Provost's recommendation, a meeting with the Provost to urge reconsideration, and a full appellate grievance procedure.  R. 20-2 (Faculty Agreement at 34) (Page ID #709).  Because Kathleen voluntarily withdrew from the internal review process before a final decision was made, we may not speculate whether Provost Shapiro ultimately would have denied her application.  *See Okruhlik*, 395 F.3d at 880–81.  Moreover, the intermediate recommendations were not used in a way that would "directly influence" the eventual final decision:  Provost Shapiro was permitted to consult the intermediate recommendations when he made the final decision regarding Kathleen's salary supplement, but the Faculty Agreement required him to make an independent decision based on his review of the record.  Thus, although the EAS Department and Dean

Davison both made negative recommendations, Kathleen resigned before CMU took an "adverse action" against her in the form of a final decision denying her application for a pay increase.[2]

Although the negative recommendations on Kathleen's application for a salary supplement are not adverse actions, the Benisons have produced sufficient evidence from which a reasonable jury could conclude that the other two actions taken against them were adverse actions. First, CMU's decision to file a lawsuit against Kathleen to recover her sabbatical compensation is an adverse action. A reasonable individual might have been dissuaded from engaging in protected conduct by the threat of a lawsuit holding her liable for more than $50,000. *See Dye*, 702 F.3d at 304 (concluding that the withdrawal of "key benefit" was an adverse action because it "imposed a . . . financial burden" on the plaintiffs); *see also Conrad v. Robinson*, 871 F.2d 612, 615 (6th Cir. 1989) (implicitly accepting the argument that a libel lawsuit was filed in retaliation for Title VII protected activity). Second, a reasonable individual could have been dissuaded from engaging in protected activity by the threat of a transcript hold that prevented him from being able to "complet[e] his elementary education teaching degree work and certification." R. 1 (Compl. ¶ 32) (Page ID #8). A serious obstacle to the completion of an educational program is the kind of "injury that would likely chill a person of ordinary firmness from continuing to engage in [protected] activity." *Paige v. Coyner*, 614 F.3d 273, 281 (6th Cir. 2010). Because the Benisons have provided evidence sufficient to demonstrate that CMU took two adverse actions against them, we must next consider whether they have presented evidence that either adverse action is causally connected to the protected conduct.

"A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action," *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010), or

---

[2]The Benisons also make the related claim that Kathleen was constructively discharged when she was denied a promotional salary supplement. They argue that Morgan's threat that he "would vote [Kathleen] down for future promotion" and the administration's favorable reaction to the news that she would be leaving CMU support the inference that she was "forced out" and would "never . . . be treated fairly at CMU again." R. 20-4 (Benison Dep. at 110, 174) (Page ID #817, 819). However, even if Kathleen had "little hope of further advancement," *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002), she has not shown that her working conditions were "intolerable" in a way that forced her to resign. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *see also Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (rejecting the argument that the defendant's failure to promote the plaintiff was constructive discharge). Accordingly, we conclude that summary judgment in favor of CMU on the Benisons' constructive discharge claim was appropriate.

demonstrating "the disparate treatment of similarly situated individuals." *Thaddeus-X*, 175 F.3d at 399.  If the causal connection is to be demonstrated through circumstantial evidence, the panel may consider "incidents of misconduct that do not rise to the level of an adverse employment action" if those incidents "show a pattern of mistreatment on the job based on plaintiff's protected activities." *Dye*, 702 F.3d at 305 (internal quotation marks omitted).  Generally, "in the First Amendment context, a defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Id.* at 308 (internal quotation marks omitted).

The Benisons have provided evidence to support the reasonable inference that the Defendants decided to file a lawsuit against Kathleen to recover sabbatical pay because of her husband's involvement in the no-confidence resolution.  The Benisons argue that they can demonstrate a causal link because the lawsuit decision followed the no-confidence vote in time and Kathleen is the sole faculty member whom CMU has ever sued for failing to return compensation paid during a sabbatical.  Under some circumstances, close temporal proximity between protected conduct and an adverse action may be sufficient on its own to raise an inference of causation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  Temporal proximity alone is insufficient to demonstrate causation in this case, however, because the decision to seek repayment of sabbatical compensation came approximately seven months after Christopher sponsored the no-confidence resolution.  To be sure, CMU could not have filed suit until after Kathleen resigned in June, and the administration promptly decided to seek repayment only weeks after she did resign.  Nonetheless, a lag time of more than six months between protected conduct and an adverse action does not permit a strong causal inference, both because the occurrence of intervening events weakens the relationship and because it is reasonable to expect that the Benisons had the opportunity to identify other circumstantial evidence to support their claim. *See id.*

Although the temporal relationship between the no-confidence resolution and the filing of the lawsuit is not on its own sufficient, the Benisons argue that they have identified additional evidence of causation.  First, the Benisons argue that improprieties during the EAS Department's consideration of her application demonstrate that CMU acted with a retaliatory motive.  Specifically, they claim that the EAS Department improperly expanded upon the service

requirements set forth in department bylaws, discounted exemplary service rendered by Kathleen, misinterpreted incidents in which she declined to take on additional service (i.e., the department assessment), and took the unprecedented step of recommending that a promotion be denied "on the basis of service alone." R. 20-3 (Hatch Dep. at 37) (Page ID #753). They also argue that two members of the Department, Leigh Orf and Sven Morgan, improperly influenced other members of the Department to vote against Kathleen by telling them that they intended to "teach her a lesson" about Christopher's no-confidence vote. R. 20-4 (Benison Dep. at 39) (Page ID #813). Although these types of incidents are not themselves adverse actions, we may consider them in combination to assess whether they demonstrate a pattern of retaliatory mistreatment, which could support a causal inference. *See Dye*, 702 F.3d at 305. The circumstantial evidence of retaliatory animus at the department level does not aid the Benisons in this case, however, because they have not identified any evidence suggesting that Morgan, Orf, or any other member of the EAS Department was involved in the decision to file a lawsuit against Kathleen. To the contrary, an email chain between Dean Davison, Provost Shapiro, and President Ross reveals that they discussed and decided amongst themselves that they would file suit against Kathleen to recover the value of her salary and benefits for the Spring 2012 semester. R. 20-4 (Compensation Repayment Emails) (#875–77, 881–83). Thus, to the extent that Morgan or Orf made comments suggesting a retaliatory motive, those comments are not relevant to demonstrate that President Ross, Provost Shapiro, or Dean Davison—a different set of individuals, who were not in a position to be influenced by department members—decided to file the lawsuit in retaliation for Christopher's protected conduct.

Second, the Benisons argue that a jury could draw the reasonable inference that the decision to file a lawsuit against Kathleen was motivated by protected conduct because CMU had never before filed suit against a professor who violated a contractual duty to return following sabbatical. A plaintiff who chooses to prove retaliatory intent by using comparators must show that he "and the employee with whom [he] seeks to compare himself . . . [are] similar in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted). However, when the sample size of possible comparable employees is small, a court should not apply the "similarly-situated" requirement so

stringently that it "deprive[s a plaintiff] of any remedy to which he may be entitled under the law." *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396–97 (6th Cir. 2008).

In the past ten to fifteen years, only four CMU professors, aside from Kathleen, have resigned following a sabbatical in violation of their contracts. Of the four professors, CMU waived the obligation to repay compensation for three and chose not to file a lawsuit to enforce the contract against the fourth. R. 16-4 (Serra Aff. at 2–3) (Page ID #516–17). CMU argues that Kathleen is not similar to the other professors in "all of the relevant aspects," and thus no reasonable inference of causation can be drawn from the comparison. Specifically, CMU argues that the other professors were not required to repay their sabbatical compensation because they had resigned for family or medical reasons, because they had negotiated a waiver before resigning, or because they resided outside of the United States and were therefore collection-proof. R. 16-4 (Resignation Communications) (Page ID #519–43). However, the correspondence surrounding these resignations shows that, for at least one of these professors, CMU concluded that there was not a medical problem preventing the professor from "return[ing] to active status," R. 16-4 (Mathematics Professor Letter) (Page ID #532), but nonetheless elected to waive the obligation. Given the small number of comparators available to the Benisons, a reasonable jury could conclude that CMU's decision to file a lawsuit against Kathleen constitutes disparate treatment that raises an inference of causation.

Furthermore, because we conclude that the Benisons have provided evidence of causation with respect to the filing of a lawsuit against Kathleen, we also conclude that they have provided evidence of causation with respect to the hold on Christopher's transcript. The transcript hold was a direct result of the decision to recover Kathleen's sabbatical compensation and accompanying lawsuit: Had CMU not required Kathleen to repay her salary and benefits, including Christopher's tuition remission, the university's policy of placing holds on the transcripts of students with outstanding tuition balances would not have been triggered. *See* R. 16-3 (Shapiro Dep. at 108) (Page ID #297). Therefore, the placement of a hold on Christopher's transcript cannot be logically separated from the filing of a lawsuit against Kathleen, and Christopher's prima facie case rises or falls with Kathleen's.

Accordingly, we conclude that the Benisons have created a genuine dispute of material fact with respect to a prima facie case of retaliation based on CMU's decision to file a lawsuit against Kathleen seeking recovery of her sabbatical compensation and the placement of a hold on Christopher's transcript. Because the Benisons have presented evidence sufficient to prove a prima facie case of retaliation, we will next consider whether CMU can "demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct," such that no reasonable jury could conclude otherwise. *Dye*, 702 F.3d at 294–95 (internal quotation marks omitted).

## B. Same Decision Absent Protected Conduct

CMU argues that, even if the Benisons can demonstrate a prima facie case of retaliation, it is nonetheless entitled to summary judgment because it would have made the same decision to file a lawsuit even in the absence of Christopher's sponsorship of the no-confidence resolution. There is no doubt that CMU had an arguably meritorious claim for breach of contract: Kathleen signed a contract obligating her to return to teach at CMU following her sabbatical or to repay the compensation she received during her sabbatical leave. R. 20-2 (Sabbatical Agreement) (Page ID #738). Provost Shapiro had the option to waive the obligation at his discretion, but he was not required to do so. Nor is there any doubt that CMU was legally entitled to pursue its claim in state court. Thus, there is no doubt that CMU legally *could have* taken the same action against the Benisons absent the constitutionally protected conduct. However, there remains considerable doubt whether CMU *would have* filed a lawsuit to enforce its contractual rights had Christopher not played a role in passing the no-confidence resolution against Provost Shapiro and President Ross.

The Benisons have presented evidence from which a reasonable jury could infer that CMU would not have chosen to sue Kathleen to recover her sabbatical compensation absent Christopher's role in the no-confidence resolution. As we have already discussed, at least four other professors refused to return to CMU following sabbatical leave. One of those professors was prevented from returning because of her health, and was thus excused from the obligation to repay her compensation by the terms of the Faculty Agreement. R. 20-2 (Faculty Agreement at 59) (Page ID #714). However, CMU had the same contractual right to recover sabbatical

compensation against the other three professors as it had against Benison, and yet it chose not to enforce the right in court on any of those occasions. *See* R. 16-4 (Hanessian Email) (Page ID #519) (excusing obligation on the basis of exemplary work for the department); *id.* (Jeon Email) (Page ID #529) (declining to collect on obligation because the professor resided in Korea); *id.* (Mathematics Professor Ltr.) (Page ID #532–33) (waiving obligation for professor who had health problems but was "able to return to active status"). Although CMU asserted reasonable justifications for its decision not to file suit on other occasions, a reasonable jury could infer from this pattern that CMU would not have filed the lawsuit against Kathleen, even if it had the legal right to do so, absent the protected conduct. Accordingly, the Benisons have provided sufficient evidence to create a genuine dispute of material fact regarding whether they were subjected to First Amendment retaliation when CMU filed a lawsuit against Kathleen to recover the compensation paid to her during her sabbatical leave.

## IV. QUALIFIED IMMUNITY

The Defendants argue that, even if the Benisons raised a genuine issue of material fact regarding whether they suffered a violation of their constitutional rights, the Defendants should nonetheless be granted qualified immunity because those rights were not clearly established at the time the lawsuit was filed.[3] Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Therefore, if a defendant asserts qualified immunity, the plaintiff bears the burden of showing: (1) "a violation of a constitutional right" and (2) that "the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011). A clearly

---

[3]The Benisons claim that the Defendants never raised the qualified-immunity defense in district court, and that they therefore waived the defense. Appellant Reply Br. at 28. To the contrary, the Defendants asserted qualified immunity in their Answer to the Complaint and in their motion for summary judgment. R. 9 (Answer at 13) (Page ID #38); R. 16 (Mot. for Summ. J. at 27) (Page ID #112). In their Answer, the Defendants asserted several forms of immunity to the Benisons' claims, including sovereign immunity and qualified immunity. R. 9 (Answer at 13) (Page ID #38). In their motion for summary judgment, the Defendants explained that they were "entitled to qualified immunity in regard to CMU's decision to bring its suit because the settled jurisprudence establishes that meritorious lawsuits cannot constitute retaliation." R. 16 (Mot. for Summ. J. at 27) (Page ID #112). Although neither of these documents contains expansive discussion of qualified immunity, the references were sufficient to put the Benisons and the court on notice that the Defendants were asserting their defense to suit under the qualified immunity doctrine.

established right must be described to a reasonable degree of certainty in Supreme Court or lower court precedent:

> For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . In determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.

*Bell v. Johnson*, 308 F.3d 594, 601–02 (6th Cir. 2002); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) ("[E]xisting precedent must have placed the statutory or constitutional question confronted by the official beyond debate.") (internal quotation marks omitted).

Qualified immunity is a personal defense that applies only to government officials in their individual capacities. *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009) ("As qualified immunity protects a public official in his individual capacity from civil damages, such immunity is unavailable to the public entity itself."). "In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993); *see also Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity."). Thus, personal immunity defenses, such as absolute immunity or qualified immunity, are not available to government officials defending against suit in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985).

The Benisons' surviving claims are based solely on actions taken by CMU as an entity. Although President Ross, Provost Shapiro, and Dean Davison discussed the decision to file a lawsuit against Kathleen to seek recovery of her sabbatical pay, it was CMU, not its individual administrators, that had a legally enforceable contract right. Thus, CMU as an entity filed the lawsuit against Kathleen in state court. Moreover, there is no evidence that any of the individual defendants participated in the decision to place a hold on Christopher's transcript. As with the filing of the lawsuit, it was CMU as an entity that held Christopher's transcript because of his outstanding tuition balance. Accordingly, President Ross, in his official capacity as a representative of CMU, is the only defendant against which the Benisons may proceed. Because public officials may not assert qualified immunity as a shield in their official capacities, no

defendant has the capacity to claim qualified immunity as a defense. Therefore, the Benisons' claims based on CMU's decision to file a lawsuit against Kathleen and to place a hold on Christopher's transcript were not properly dismissed on summary judgment as against President Ross in his official capacity.

## V.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court with respect to Dean Davison, Provost Shapiro, and President Ross in their individual capacities, but **REVERSE** the judgment with respect to President Ross in his official capacity and **REMAND** for further proceedings consistent with this opinion.

_____

**DISSENT**

_____

ARTHUR ALARCÓN, Circuit Judge, dissenting.  I respectfully dissent.  I do not agree with my colleagues that the district court erred in concluding that Appellants failed to present sufficient evidence demonstrating that there are genuine issues of fact in dispute regarding whether CMU's state court action based on Kathleen Benison's breach of her contract to teach a full year following her sabbatical leave was filed in retaliation for her husband Christopher Benison's successful sponsorship of a vote of no confidence in the president or provost of CMU.  I also disagree that the evidence presented by Appellants was sufficient to demonstrate that CMU's hold on Christopher Benison's transcript was a retaliatory act for his exercise of his First Amendment rights.

I

The dispositive facts are not in dispute.

Christopher Benison sponsored the resolution of a vote of no confidence in December 2011.  Kathleen Benison violated her contract with CMU to serve for at least year after returning from her sabbatical leave by accepting an appointment at a different university in late May of 2012.

I agree with the majority that the presumption of temporal proximity to demonstrate retaliation is inapplicable in this matter because the state court action to seek repayment was filed approximately seven months after Christopher Benison sponsored the no-confidence resolution.

II

Appellants contend that a jury could reasonably infer that the filing of an action by CMU for Kathleen Benison's breach of contract was retaliatory because the university had never before filed a lawsuit against a professor who violated a contractual duty to return following a sabbatical leave.  This argument is a classic example of the logical fallacy of *post hoc ergo*

*propter hoc*, i.e., "after this, therefore because of this."  Black's Law Dictionary 1355 (10th ed. 2014) ("The logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential.").

The record shows that hundreds of professors at CMU have taken sabbaticals over the last 10–15 years.  During that time only four professors aside from Kathleen Benison have not returned to CMU following their leave, and failed to repay the compensation for the sabbatical leave.  The evidence presented by CMU showed that three of the professors were not required to repay their sabbatical compensation because they resigned for family or family medical reasons, negotiated a waiver before resigning, or resided outside of the United States and were judgment-proof.  There is no evidence in the record to demonstrate that CMU did not have an appropriate business reason not to file an action against any professor who deliberately breach his or her sabbatical leave contract.

### III

I cannot agree with the majority's conclusion that the fact that CMU may have previously waived the obligation of one professor to repay his sabbatical obligation demonstrates that a rational trier of fact could draw a plausible inference that the filing of the state court action was retaliatory.

Appellants have failed to present any evidence to demonstrate that the filing of a state court action against Kathleen Benison for breaching her sabbatical leave contract and the placing of a hold on her husband's academic transcript demonstrates that there is a genuine issue of fact in dispute regarding whether these acts were taken by CMU to retaliate for Christopher Benison's exercise of his First Amendment rights.  Accordingly, I would affirm the district court's judgment granting Appellees' motion for summary judgment.