RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KENNETH J. KUBALA,

*Plaintiff-Appellant*,

*v.*

RANDY SMITH; TRUMBULL COUNTY, OHIO,

*Defendants-Appellees*.

No. 20-3085

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:18-cv-01988—George J. Limbert, Magistrate Judge.

Argued:  October 9, 2020

Decided and Filed:  January 7, 2021

Before:  BOGGS, STRANCH, and THAPAR, Circuit Judges

─────────────────

**COUNSEL**

**ARGUED:**  David L. Engler, ENGLER LAW FIRM, Warren, Ohio, for Appellant.  Jeffrey A. Stankunas, ISAAC WILES BURKHOLDER & TEETOR, LLC, Columbus, Ohio, for Appellees.  **ON BRIEF:**  David L. Engler, ENGLER LAW FIRM, Warren, Ohio, for Appellant.  Jeffrey A. Stankunas, Molly R. Gwin, ISAAC WILES BURKHOLDER & TEETOR, LLC, Columbus, Ohio, for Appellees.

---

**OPINION**

---

BOGGS, Circuit Judge.    Kenneth Kubala (Appellant) sued his former employers, Trumbull County Engineer Randy Smith and Trumbull County, Ohio (collectively Appellees) in the Trumbull County Court of Common Pleas for (1) sexual harassment (hostile-work-environment sex discrimination) under Ohio Revised Code § 4112 and for (2) violating his First Amendment rights, under 42 U.S.C. § 1983.  Appellees removed to federal district court, and the parties consented to a ruling by a magistrate judge.  The district court granted Appellees' motions for summary judgment and dismissed Kubala's state and federal claims with prejudice. Kubala appealed to our court.

The district court lacked supplemental jurisdiction over Kubala's state sexual-harassment claim because that claim shares no common nucleus of operative fact with his constitutional claim.  We therefore vacate the district court's dismissal of Kubala's state-law claim and direct the district court to dismiss that claim without prejudice for want of subject-matter jurisdiction. Kubala fails to show that Smith violated his First Amendment rights because the alleged threat is too ambiguous.  We therefore affirm the district court's dismissal of Kubala's First Amendment claim.

## I. FACTS AND PROCEDURE

### A.  Facts

Kubala worked as the Safety Manager for the Trumbull County Engineer's Office from October 11, 2011, until he resigned on May 11, 2018.  Kubala was a "fiduciary" employee, meaning that he was not under civil-service rules and was allowed to participate in partisan political activities.  Kubala reported directly to Smith, the Trumbull County Engineer, and was part of Smith's management team.  The Trumbull County Engineer is an elected position. Fiduciary employees are also called "unclassified" employees.

1) State sexual-harassment claim

Kubala claims that Smith sexually harassed him and created a hostile work environment. Kubala described the harassment in his complaint, in fifty-eight pages of notes made during his employment, and in deposition testimony. The allegations portray Smith as a vulgarian and a bully obsessed with Kubala's supposed homosexuality. A few examples include:

a.    Smith asked Kubala whether Kubala was "homosexual."

b.    Smith told Kubala that a man named "Richard" was lying on a sheepskin rug in Smith's home waiting for Kubala. Kubala thought Smith was suggesting a sexual liaison between Kubala and Richard.

c.    On "dozens" of occasions throughout 2014 to 2016, Smith would suggestively lick a beverage can in Kubala's presence.

d.    On March 22, 2017, at a meeting with other employees, Smith told Kubala to place his "wiener" in another employee's ear.

e.    Multiple times, beginning in 2014 and into 2018, Smith told staff at the Ponderosa restaurant that he was trying to fix Kubala up with a man.

f.    In 2016, Kubala overheard Smith making comments about Kubala and one of the waiters at a Mexican restaurant. Kubala heard Smith state that the waiter was Kubala's boyfriend and that Kubala and the waiter were going out on a date.

g.    Smith told another employee that Smith had "caught" Kubala. Kubala interpreted that comment to mean that Smith claimed to have "caught" him masturbating at work.

h.    In the presence of Smith, Steve Papalas told Kubala that he would like Kubala to "spank my ass." Kubala alleges Papalas said this because Smith's behavior created a hostile work environment that encouraged others to harass Kubala.

Kubala told Smith to stop again and again. But Smith continued to make a cruel art of implying that Kubala is gay. Kubala told Herb Laukart, the office's human-resources manager, that he was tired of Smith's comments. According to Kubala, Laukart proved useless. Laukart told Kubala that Smith could not be controlled, and that Smith was going to do what he wanted.

2) First Amendment retaliation claim

Kubala claims that his running for political office against Smith's wife and his attendance at certain political functions triggered an adverse employment action when Smith threatened to

change Kubala's job status to "classified" (civil service).  This change would prevent Kubala from running for office and continuing his involvement in local politics.  In particular, Kubala alleges:

a.      Smith told Kubala not to attend political functions of two officials with whom Smith was upset.

b.      Smith put his arm around Kubala, smacked him on the back three times, had Kubala sit down, and told Kubala that when Kubala was in the voting booth thinking about voting for one candidate, Smith would be thinking about Kubala instead voting for a candidate Smith favored.

c.      Kubala testified that Smith's attorney, Matthew Blair, asked Kubala if he wanted to change his job status to "classified" because he would be "protected."  Kubala interpreted it as a threat of retaliation.  He explained that "Matt approached me and said, 'You will be protected if you change classifications.'  That was basically the bottom line there."

3) Kubala's resignation

Kubala resigned on May 11, 2018.  His resignation letter stated he was resigning under stress of "an unhealthy work environment."  Kubala testified that his physical and mental health were harmed by the hostile work environment that Smith perpetuated:

> I consider it an unhealthy work environment affecting my health.  My health is more important.  I was building up a lot of anger and my blood pressure was high.  Anger was a variable to that—and stress.

When he resigned, Kubala was under the care of Doctor Phillip Malavasi (DO) and therapist Anthony Ciccone.  Kubala initially sought psychological counsel in 2015 to cope with the harassment.  Dr. Malavasi treated Kubala for high blood pressure, which Kubala attributed to his harassment.  Kubala continues to see his therapist.

**B.  Procedure**

Kubala filed his complaint in the Trumbull County Court of Common Pleas.  Smith and Trumbull County removed the case to United States district court on August 29, 2018.  After discovery, Smith and Trumbull County moved for summary judgment on August 29, 2019.  Magistrate Judge Limbert granted summary judgment to Smith and Trumbull on December 27, 2019.  Kubala filed a timely appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the district-court order under 28 U.S.C. § 636(c)(3). "We review the district court's order granting summary judgment for [Appellees] *de novo*." *Jones v. Clark Cnty.*, 959 F.3d 748, 756 (6th Cir. 2020). A court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court should grant summary judgment if, "'in light of the evidence viewed . . . most favorabl[y] to the [non-moving party], no reasonable juror could fail to return a verdict for the [moving party].'" *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012)).

## III. SEXUAL-HARASSMENT CLAIM

### A. Kubala's State Sexual-Harassment Claim Does Not Support Supplemental Jurisdiction Because It Shares No Common Nucleus of Operative Fact with His First Amendment Claim

Kubala's sexual-harassment claim is factually unrelated to his First Amendment claim. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Supreme Court has held "[t]hat provision applies with equal force to cases removed to federal court as to cases initially filed there; a removed case is necessarily one 'of which the district courts . . . have original jurisdiction.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (citing 28 U.S.C. § 1441(a)).

The question of whether a court has properly assumed supplemental (pendent) jurisdiction "remains open throughout the litigation." *United Mine Workers v. Gibbs*, 383 U.S. 715, 727 (1966). Even after a jury trial, "dismissal of the state claim might . . . be merited." *Id.* "[I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *Id.* at 726–27. The

test in *Gibbs* remains the standard for pendent jurisdiction: "[t]he state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." *Id.* at 725.

Where the Supreme Court has found "a common nucleus of operative fact," the factual connection between the state and federal claims most often involve the same incident. In *International College of Surgeons*, the Court held that the state and federal claims of the International College of Surgeons (ICS) against Chicago "'derive from a common nucleus of operative fact,' . . . namely, ICS' unsuccessful efforts to obtain demolition permits from the Chicago Landmarks Commission." 522 U.S. at 165 (quoting *Gibbs*, 383 U.S. at 725). In *Carnegie-Mellon University v. Cohill*, the Court noted that the plaintiff's "state-law claims fell within the jurisdiction of the District Court to which the action was removed because they derived from the same nucleus of operative fact as the federal-law claim: CMU's dismissal of [an employee]." 484 U.S. 343, 350–51 (1988). In *Owen Equipment & Erection Co. v. Kroger*, the common nucleus of operative fact was the death of the plaintiff's husband. 437 U.S. 365, 367 (1978); *see also Moor v. Alameda Cnty.*, 411 U.S. 693, 695, 712 (1973) (finding a common nucleus of operative fact where plaintiffs' state and federal claims arose from a deputy sheriff injuring them when responding to the same civil disturbance); *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1055 (6th Cir. 1986) (finding pendent jurisdiction proper where federal and state claims were based on closing of the Cleveland Press newspaper).

Kubala's sexual harassment-claim is based on Ohio Revised Code § 4112 alone, not federal law. Although Kubala claims the sexual harassment and First Amendment retaliation were both inflicted by Smith, Kubala's state and federal claims do not share "a common nucleus of operative fact," *Gibbs*, 383 U.S. at 725, or indeed any fact other than his employment status. There is no "substantial similarity between the predicate factual findings necessary to the resolution of both the federal and state law claims." *Cleveland Press*, 787 F.2d at 1055. Kubala alleges that Smith violated his First Amendment rights in July 2017 and twice in February 2018 through conversations with Smith and attorney Matt Blair. Kubala does not claim that any

sexual harassment was related to those conversations. Nor does he allege that the First Amendment retaliation was motivated by Smith's interest in his sexuality. Kubala alleges that the retaliation was motivated by competing interests in local politics but that "Smith's sexually inappropriate conduct was the overriding factor in [his] decision to resign from his job." (Appellant Br. at 35). Not once does Kubala allege that his conversation with Blair or a fear of retaliation was a reason for quitting.

We have hesitated to question a district court's exercise of pendent jurisdiction when the federal claim was dismissed on summary judgment. *See, e.g.*, *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1413 (6th Cir. 1991). "[O]verwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial." *Id.* at 1412. Here, the district court dismissed Kubala's state and federal claims on summary judgment. There is an interest in judicial economy. But subject-matter jurisdiction reaches beyond efficiency concerns to the foundations of our constitutional structure: the separation of powers between the federal government and the states. We may not, and must not, hear a case over which we have no power. In *Aschinger*, there was a common nucleus of operative fact between the federal and state claims: the fraudulently induced dispositions of the plaintiff's company stock. 934 F.2d at 1413 ("The district court did not err in granting summary judgment to defendants on plaintiff's state law claims of fraud and breach of fiduciary duty [because] plaintiff must prove essentially the same elements under the state provisions as he must prove under the federal provision."). Kubala's sexual-harassment and First Amendment claims share no operative facts because no harassment occurred during the alleged First Amendment violations. Therefore, the district court had no jurisdiction to hear Kubala's state sexual-harassment claim.

## IV. FIRST AMENDMENT RETALIATION CLAIM

### A. Kubala Fails to Establish a Prima Facie First Amendment Retaliation Claim

The First Amendment guards against official retaliation based on protected speech and political affiliation. *Dye*, 702 F.3d at 294. The plaintiff must show: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that

would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Id.* (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)).

1) Kubala engaged in activity protected by the First Amendment

Kubala alleges that running for political office against Smith's wife and attending the political functions of people Smith disliked triggered Smith's threat to reclassify him. The trial court did not discuss the protected-activity element of Kubala's First Amendment claim. But attending political functions in support of candidates and running for political office are paradigmatic examples of protected speech. *See, e.g.*, *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1417 (2016). "Core political speech is [the] most jealously guarded" form of expression under the First Amendment. *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (en banc).

2) Smith did not take an adverse employment action against Kubala that would inhibit a person of ordinary firmness from exercising his First Amendment rights

This is where Kubala's First Amendment claim fails. Kubala bases his claim on two interactions with Smith and one with Smith's lawyer. First, Smith told Kubala not to attend the political functions of two officials Smith disliked. Second, "Smith . . . put his arm around [Kubala], smacked [him] three times on the back . . . [and] said, 'Sit down.'" He said to Kubala: "When [Kubala was] in that ballot booth thinking about voting for [one candidate], [Smith would] be thinking about [Kubala] voting for [the candidate that he wanted]." Finally, when Kubala ran for a precinct position against Smith's wife, Kubala alleges that Smith (through Blair) retaliated against Kubala by threatening to change his job classification so that he would be prohibited from participating in politics.

An adverse employment action "would chill or silence a 'person of ordinary firmness' from future First Amendment activities." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (quoting *Thaddeus-X*, 175 F.3d at 397); *see also Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006). To show adverse action, an employer need not deploy its full power to discharge an employee. Adverse actions beyond those that

create only de minimis negative consequences offend the Constitution. *See, e.g., Thaddeus-X*, 175 F.3d at 398. The adverse action need not actually chill or silence the plaintiff's First Amendment activities. Nor must the plaintiff possess an Olympian fortitude. A plaintiff need only show that the adverse action would deter a person of ordinary firmness from exercising his First Amendment rights. *See Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010); *see also Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008).

Most of the relevant Supreme Court and Sixth Circuit cases concern actual retaliation, not threats of retaliation, and firings constitute the bulk of the cases. *See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 372 (1976) (holding public employees could not be fired because of their politics unless they held "policymaking" or "confidential" positions); *see also O'Hare Truck Serv.*, *Inc. v. City of Northlake*, 518 U.S. 712, 714–15 (1996) (holding discharge of independent contractor for refusing to support political party violated First Amendment). In *Rutan v. Republican Party of Illinois*, the Supreme Court extended *Elrod* to include not only firings but also promotion, transfer, recall, and hiring decisions. 497 U.S. 62 (1990). "The term 'adverse action' is drawn from employment case law; examples in that context include discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Thaddeus-X*, 175 F.3d at 396. The Supreme Court has held that adverse actions also include the "imminent danger of being discharged," at least when other colleagues were discharged "for the same reasons." *Elrod*, 427 U.S. at 351.

We have held that "threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010). The first two instances here, Smith telling Kubala not to attend political functions and how to vote, involve no retaliation or threat of retaliation. Without more, a reasonable juror could not conclude that Smith asking Kubala, through Blair, if he wanted to change his job classification would deter a person of ordinary firmness from exercising his First Amendment right to engage in political activity. *See, e.g.*, *Ctr. for Bio–Ethical Reform, Inc.*, 477 F.3d at 822. Threats of retaliation in the case law have been clear. What Kubala asserts is too ambiguous.

In *Fritz v. Charter Township of Comstock*, we held that three phone calls by a township supervisor to the plaintiff's employer were threats that met the adverse action requirement. 592 F.3d 718 (6th Cir. 2010). *Fritz* can be distinguished from Kubala's case. First, the threats in *Fritz* were made by a person with the power to carry out the threat, not by proxy. Second, the threats in *Fritz* were clear. In the first call, the *Fritz* defendant told the plaintiff's employer that if the plaintiff would "tone down her speech and remove her sign [criticizing the township], her problems might go away." *Fritz*, 592 F.3d at 721. This is an obvious threat meant to chill protected speech. Third, the threats occurred repeatedly, not just once. When the plaintiff's criticism of the township continued, the defendant called again and told the plaintiff's supervisor that her public criticism would create adverse consequences for both the plaintiff and her employer. *See id*. In the third call, the defendant warned that the employer's presence in the township was in peril because the plaintiff's conduct made the community upset. *See id*. A threat need not be made more than once. But repetition may render otherwise opaque threats clear. Here, Kubala was asked about changing his classification only once.

Two other cases involving threats of retaliation were unambiguous threats made by those with the power to carry them out. In *Hill*, 630 F.3d at 474, we held that a federal prison staff's threats to transfer an inmate to another prison were adverse actions "capable of deterring a person of ordinary firmness from engaging in protected conduct." In *Pasley v. Conerly*, 345 F. App'x 981 (6th Cir. 2009), a prison staff member told the prisoner that "if he filed a grievance, she would have him transferred out of the unit and he would lose his job." *Id*. at 983. She then stated, "I use [sic] to be married to a warden and I will have your ass transferred so far up North that your family [won't] recognize you when you get back." *Id*.

Here, it was not Smith, but Blair, who asked Kubala about changing his job classification. Blair was the outside attorney that represented the Trumbull County Engineer's Office. Kubala argues that it was reasonable for him to infer that Blair was speaking for Smith. Perhaps. But none of the relevant cases involve threats by an agent or proxy. To be sure, a threat by proxy in no way shields the principal when other evidence reveals a threat. But when it is doubtful that a threat was made at all, that it was done by a third party may increase the doubt. Here, ambiguity abounds. Kubala claims that Smith, through Blair, threatened Kubala because

he was running against Smith's wife for a precinct position.  In light of Smith's telling Kubala not to attend a political function and telling him to vote for a candidate Smith favored (and Kubala ignoring Smith), Kubala interpreted his conversation with Blair as Smith threatening him with "repercussions if Kubala continue[d] to defy Smith's directives on how Kubala acted politically."

Kubala's theory requires us to draw too many inferences.  Blair never mentioned Smith or Smith's wife to Kubala.  Blair did not demand, but "asked," if Kubala wanted to change his classification.  When Kubala asked Blair why he should change classifications, Blair said, "You will be protected if you change classifications."  Kubala perceived this as a threat of retaliation.  But Blair's words were true: Kubala *would* be protected if he changed classifications.  Classified employees enjoy civil-service protections that unclassified employees do not.  These circumstances do not indicate an unambiguous threat.  Usually workers, especially those in an uncertain situation, prefer civil-service protection, and the more plausible threat is to make a job subject to political removal.  In fact, we have not found one case claiming First Amendment retaliation where the alleged chilling act would have *created* civil-service protection.  Smith talked to Kubala about Smith's wife's involvement in politics before, but Smith never talked to Kubala about changing his job classification.  Most importantly, Kubala was never again asked to change his classification and alleges no adverse action after his conversation with Blair, even though Kubala made it clear he did not want to change his classification.  Blair talked to Kubala near the end of February 2018, and Kubala did not quit until May 2018.  Kubala alleges no other time in the intervening months that Blair or Smith raised the issue of Kubala's job classification or retaliated against Kubala in any way.

Kubala said in his resignation letter and deposition that he quit because it was "an unhealthy work environment."  Kubala's appellate brief states that "Smith's sexually inappropriate conduct was the overriding factor in [his] decision to resign from his job." (Appellant Br. at 35).  Kubala does not mention his conversation with Blair or a fear of retaliation as one of his reasons for quitting.

Smith may have meant to threaten Kubala.  Taking the allegations as true, Smith is a bully, and bullies are often skilled in going up to "the line" without crossing it.  But the

statements alleged here do not rise to the level of an actionable threat.  Kubala fails to show he was threatened or suffered other adverse action.

## V. CONCLUSION

We therefore VACATE the district court's judgment on Kubala's state-law claim and direct the district court to dismiss Kubala's state-law claim without prejudice for want of subject-matter jurisdiction.  We AFFIRM the district court's dismissal of Kubala's First Amendment claim with prejudice.