NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0523n.06

Nos. 16-4084/4086

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 12, 2017
DEBORAH S. HUNT, Clerk

JEAN LIFTER; SHELDON GELMAN,

    Plaintiffs-Appellants/Cross-Appellees,

v.

CLEVELAND STATE UNIVERSITY; CRAIG
BOISE,

    Defendants-Appellees/Cross-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE: BOGGS, GRIFFIN, and WHITE, Circuit Judges.

BOGGS, Circuit Judge. This is a First Amendment retaliation case. Married plaintiffs Sheldon Gelman and Jean Lifter were employees of the Cleveland-Marshall College of Law. When, after the 2008 financial crisis, the law school faced mounting pressure to trim class sizes and reduce enrollment, Gelman, a tenured professor, spearheaded a successful union-organizing campaign among the law faculty. The following spring, Gelman and several other pro-union faculty received a low and allegedly symbolic $666 merit raise. Just over a year later, Lifter's employment was terminated. Both filed claims against the university and law-school dean Craig Boise under 42 U.S.C. § 1983, alleging that Gelman's raise, his being deprived of committee appointments, and Lifter's termination constituted retaliation for Gelman's protected First Amendment conduct. The defendants filed a motion for summary judgment, which the court granted. The plaintiffs appeal the district court's decision, and the defendants have filed a cross-

appeal. For the following reasons, we affirm the district court as to Gelman, dismiss Lifter's claim for lack of standing, and dismiss the defendants' cross-appeal as moot.

I

A

In June 2011, Cleveland State University (CSU) appointed Defendant Craig Boise as Dean of the Cleveland-Marshall College of Law. During this time, law schools nationwide were experiencing a sharp decline in the number of applicants, and the Cleveland-Marshall College of Law was no exception. Both parties agree that the law school's application decline exceeded national averages during this time period. *See Lifter v. Cleveland State Univ.*, 202 F. Supp. 3d 779, 781 (N.D. Ohio 2016).

In an effort to combat declining applicant numbers and boost its standing in the ranking of law schools published by U.S. News & World Report, Boise announced a "140 Plan" in April 2012. *Ibid.* The plan called for a reduction of the law school's entering class size from 200 to 140 students, along with corresponding expense reductions, faculty attrition, and a tuition increase. As originally proposed, however, the plan did not call for any faculty or staff reduction in excess of the anticipated rate of attrition.

Boise's "140 Plan," in conjunction with the diminishing rate of law-school enrollment led Plaintiff Sheldon Gelman, then a tenured professor at the law school, to consider unionizing the faculty. Gelman, with Boise's permission, began holding meetings at the law school in April 2012 with faculty members interested in unionizing. *Ibid.* Faculty debated the merits of unionizing over the summer, and by November 2012, Gelman announced that the union-organizing drive at the law school was a success. *Ibid.* CSU President Ronald Berkman and Boise agreed to "take no hard stance against the unionization effort," and Gelman indicated that

a request had been made to the State Employment Relations Board (SERB) to recognize the bargaining unit as the exclusive representative of the law-school faculty. *Id.* at 781-82. By June 2013, SERB granted the petition and certified the bargaining unit.

Although Boise never formally opposed the faculty-unionization effort, he did make it clear that he felt that it was causing friction within the law school. In a November 28, 2012 faculty meeting, Boise expressed feeling a "continuing disconnect" between himself and some members of the faculty. Boise specifically criticized Gelman at the meeting for allegedly approaching one of his staff members and asking for information to "go after" Boise. *Id.* at 781. "Shame on you Sheldon Gelman," Boise declared, "Shame on you." Boise called for unity at the law school, reminding faculty members that "[w]e have students to teach and a reputation to uphold." After the meeting, several professors wrote Boise to express dismay at Boise's "public attack on Prof. Gelman at the faculty meeting," which they felt "should have been dealt with in private between [Boise] and [Gelman]."

B

In the spring of 2013, following Gelman's successful union drive, Boise determined the amount of merit raises that faculty members would receive in the following year. Gelman, as well as several other faculty members involved in organizing the law-faculty union, received raises of $666, while other faculty members received raises of $3,000 and $5,000.[1] In a June 17, 2013 email, Boise explained that the pay raises were the result of a meritocratic mathematical calculation:

> I initially set two merit raise categories based on faculty performance in the areas
> of scholarship, teaching and service, with the most meritorious faculty receiving a

---

[1] The pay-raise divide did not fall precisely on pro-union and anti-union lines. Both parties agree that several faculty members who were not active in unionizing received the $666 raises and that several faculty members who were active in unionizing received raises of $3,000 and $5,000.

merit increase of $6,000 each, and the next most meritorious group of faculty receiving $3,000 each. Given a total merit pool of 2%, this would have resulted in about 14 of the 35 non-administrative faculty members not receiving any increase at all. Although these 14 faculty members did not merit a raise on the order of that received by the remaining 21 faculty members, I was reluctant to not provide *any* pay increase to 10 of these faculty members, as most faculty members received at least a $500 merit increase in FY13. Accordingly, I asked my Budget Director, Jeane White, to reduce the top merit raise to $5,000 and divide the surplus among the 10 faculty members to achieve a merit increase close to $500 per faculty member. After calculating all merit raises and two equity adjustments, the resulting merit amount was $666 per faculty member.

*Id.* at 782.

Although Boise's subsequent explanations differ slightly from this account,[2] his overall narrative has remained essentially the same. In March 2013, Boise ranked the faculty based on information that they had provided him regarding their scholarship production, teaching, and service to the community. Gelman received two points for publishing one article, one point for his teaching, and zero points for his service.[3] Gelman's total of three points left him in the bottom tier of merit raises. According to the initial calculation of the merit raises, which Boise submitted to CSU on March 29, individuals in this bottom tier were to receive raises of $727.[4] Four days after Boise submitted his proposal, he was informed that he needed to recalculate the merit raises because he relied on an inaccurate merit-pool figure.[5] One day later, Boise

---

[2] In his brief and in his declaration submitted to the court below, Boise's account omits any reference to an initially proposed $6,000 merit raise. Rather, Boise mentions only the merit-raise tiers of $3,000 and $5,000. *See* Boise's Br. at 32.

[3] Gelman alleges in his complaint that Boise refused to appoint him to several faculty committees in retaliation for his union-organizing activities, resulting in his low service score.

[4] Boise's calculation was based on a raise pool of $102,569, which represented 2.5% of the total salaries of the law-school faculty. *Lifter*, 202 F. Supp. 3d at 789. Boise created merit-raise tiers of $3,000 and $5,000 for the top-ranked faculty and then divided the rest of the pool among the remaining faculty.

[5] The initial figure had included the salary of a faculty member whose employment had been terminated. With his salary removed, the total merit-pool decreased by $3,067.

submitted a recalculated proposal in which the faculty members in the bottom tier received raises of $666. According to Boise, he arrived at that figure by reducing one clinical faculty member's raise by ten percent, reducing the raises of three faculty members in the lowest tier from $727 to $0, and subtracting the remaining reduction from the faculty members in the lowest tier. These additional equitable adjustments were designed to "incentivize outstanding performance" by requiring the faculty members in the lowest merit tier to shoulder the brunt of this last reduction in the merit-raise pool.

Gelman remained at the law school until 2015, when Boise offered him and other faculty members an incentive buyout of approximately $100,000 to retire.

C

Despite implementation of Boise's "140 Plan," the number of applicants to Cleveland-Marshall College of Law continued to plummet. Enrollment at the law school similarly suffered. By the fall of 2015, the number of student credit hours taken at the law school had decreased by 28% since 2011. *Ibid.* This marked the continuation of a trend in declining student enrollment at CSU that traces back over a decade. *Ibid.*

Because the law school's annual budget is tied to student enrollment, falling enrollment numbers led to projected budget shortfalls. Every college at CSU was required to submit its annual budget for the following academic year in April. In February 2014, the law school projected an incoming-class size of just 90 to 100 students for the fall of 2014. Tim Long, CSU's Assistant Vice President of Finance and Technology, advised Boise that, given the small projected class size, he needed to "examin[e] budget reductions of at least $1 million" for the 2014–15 fiscal year. Boise assembled a budget task force in February that included various faculty and staff members. He apprised the task force of the law school's financial situation,

provided them a list of proposed budget cuts, and asked them to "identify budget reductions to meet targets of $500,000 and $1,000,000" without increasing tuition "above the $25,000 level identified in the 140 Plan." The task force responded with a list of proposed budget cuts, but it also noted that, despite budget reductions of over $1.2 million made to full-time instructional faculty positions since 2011, total administrative salaries had actually *increased* over the same period.

At roughly the same time that Boise created the budget task force, he also emailed Associate Dean Mark Sundahl and requested information about the job duties of Plaintiff Jean Lifter, the Assistant Dean for Academic Affairs and wife of Sheldon Gelman. There is some ambiguity about the substance of Boise's request, however. Both Boise and Sundahl claim that Boise's request took place in the larger context of a conversation regarding "where potential personnel efficiencies at Cleveland-Marshall could be realized through reassigning or eliminating job responsibilities," and that it was Sundahl's suggestion to fire Lifter because "her duties [could be reallocated] among other existing staff members without disrupting operations." The record before us, however, only contains Sundahl's email to Boise that includes Lifter's job responsibilities. Although Boise's account is corroborated in the record by Sundahl's affidavit, Gelman and Lifter argue that the absence of any additional evidence pertaining to the larger conversation regarding personnel efficiencies at the law school indicates that Boise targeted Lifter in his plan to reduce administrative redundancies.

What is clear is that Boise spent most of April assembling his budget for the upcoming fiscal year. By mid-April, applicant numbers were down 28% and offers were down 18% compared to 2013. Based on these numbers and on a desire to compete with higher-tiered law schools, Boise set a target class size of 125 students for the fall class. Based on this target class

size, which was 15 students smaller than the previous year's class, Boise determined that $735,000 needed to be cut from the law school's budget. To reach this goal, Boise accepted all of the task force's recommendations that resulted in immediate savings. This included reducing travel expenses, reducing summer-research grant support, reducing the number of adjunct-taught courses, and eliminating several administrative and clinical faculty positions by attrition. Some of the task force's recommendations, however, would not realize savings until the subsequent fiscal year, particularly those that depended on personnel attrition for faculty members whose contracts had not yet expired. With all of the taskforce's immediate-savings recommendations approved, Boise still found himself short of the $735,000 in cuts that he needed to meet the reduced 125-student class size. To make up this shortfall, Boise decided to terminate Lifter's position and transfer her duties to other employees in her department, realizing $132,116 in annual savings for the law school. Boise submitted his final budget, which included the termination of Lifter's position, in April 2014. Boise stated that the budget could not be changed once submitted to CSU.

In June 2014, Lifter was notified that her position was terminated effective July 31, 2014. Faculty and staff reacted negatively to the announcement of Lifter's termination. On June 30, 2014, Boise wrote an email to the law-school faculty explaining his decision to terminate Lifter:

> On the day that I was required to make a final decision about what I expected our entering class for this year would be, we had received second deposits from 142 students. Based on our historical summer melt percentage, which has been around 10%, that would leave us with 127 students this fall. Thus, that we would enroll a class of 125 students seemed to be a prudent assumption to make based on the information that was available when I had to make the final budget decision.

These numbers are consistent with the law school's enrollment data as of June 6, 2014, over a month *after* "the day that [Boise] was required to make a final decision" about the following

-7-

year's budget in April. In addition, Boise later admitted in a deposition that the "historic summer melt percentage" was not 10% as he had originally stated, but in fact was closer to 3%. Boise called these conflicting details a "misstatement" in his deposition, noting that they nevertheless accurately reflected the law school's 2014 admission data.[6] Boise's subsequent communications with faculty, including the following statements made at a faculty meeting on September 11, 2014, and recorded in the meeting minutes, correct these numbers:

> Dean Boise distributed the Admissions Report for the week ending April 11, 2014. (See attached.) He stated that the College of Law must submit our budget to the administration on April 15, 2014. He must make the most realistic, conservative projection based on the data before him at that time. He based the projected class size on the numbers in this report. At that time we had 130 first seat deposits. Our historic melt rate from first deposits is 17%. That means that our projected class size on April 11th would have been 108 students. Even that projection would have been overly optimistic since our applications were down 28% and there were only 142 other applications still with no action.

At no point during this time did Boise's stated reason for terminating Lifter—i.e., out of budgetary necessity—change.

D

In July 2014, Lifter filed a grievance with CSU after she learned of her impending termination. This grievance was denied. Lifter and Gelman then filed Unfair Labor Practice Charges with SERB over Lifter's termination. They argued that Lifter was terminated by Boise in retaliation for Gelman's protected union-organizing activities. *Lifter*, 202 F.Supp.3d at 784. SERB rejected both Gelman's and Lifter's charges. It found that neither Lifter nor Gelman could establish a prima facie case of discrimination because they could not demonstrate a nexus

---

[6] Specifically, Boise claims that the 10% figure, which was given to him by another CSU employee, did not represent the historic summer-melt percentage, but rather the *projected* summer-melt percentage for 2014. This projected figure closely matched the actual 2014 summer-melt percentage of 9%.

between Gelman's protected activities and Lifter's termination and that, even if a prima facie case could be established, CSU provided a "persuasive rebuttal . . . that [Lifter's] layoff was implemented due to the need to reorganize because of budgetary issues."

Lifter and Gelman subsequently brought suit in federal district court under 42 U.S.C. § 1983, arguing that CSU and Boise violated their First and Fourteenth Amendment rights by terminating Lifter's employment, giving Gelman only a $666 raise, and curtailing his committee appointments in retaliation for Gelman's protected union-organizing conduct.[7] After a short period of discovery, both CSU and Boise filed a motion for summary judgment, arguing that CSU was entitled to Eleventh Amendment immunity, Boise was entitled to qualified immunity, the plaintiffs' claims were meritless, and the plaintiffs were estopped from bringing suit by virtue of their unsuccessful SERB complaints. The district court awarded summary judgment to the defendants. It first noted that, by the time summary judgment was rendered, the plaintiffs had conceded that CSU was entitled to Eleventh Amendment immunity. *Id.* at 781. It then held that the plaintiffs' SERB complaint was not preclusive because decisions of that administrative body were not appealable to any state court. *Id.* at 785–87. Reaching the merits of the plaintiffs' claims, the district court held that neither Lifter nor Gelman could make out a prima facie First Amendment retaliation claim because neither could prove that Gelman's protected conduct was a "substantial or motivating factor" behind their respective adverse employment actions. *Id.* at 789, 793.

---

[7] Although referenced in their complaint, the plaintiffs failed to advance any arguments regarding an alleged Fourteenth Amendment violation in the court below. The district court therefore treated the case solely as a First Amendment retaliation claim.

Lifter and Gelman filed this timely appeal challenging the district court's award of summary judgment. CSU[8] and Boise also filed a cross-appeal, arguing that, should we overturn the district court on the merits, we should also overturn the district court's determination that the plaintiffs' SERB complaint was not preclusive. Because the district court's dismissal was correct, we have no reason to reach the defendants' cross-appeal regarding claim preclusion.

II

"We review a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011) (citation omitted). Our job is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This does not mean that even the most insignificant factual dispute can defeat a party's motion for summary judgment. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Stated succinctly, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Hirsch*, 656 F.3d at 362 (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A

To establish a claim of retaliation for protected First Amendment conduct, a plaintiff must make out the following three elements: "1) the plaintiff engaged in constitutionally

---

[8] Although the district court indicated that the plaintiffs had conceded that CSU was entitled to immunity, and although the plaintiffs do not challenge that determination on appeal, CSU is still listed as a party to this suit. The defendants/cross-appellees request that, at a minimum, CSU be dismissed from the litigation.

protected speech; 2) the plaintiff was subjected to adverse action or was deprived of some benefit, and 3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). A plaintiff need not establish that the protected speech was the sole factor in the adverse action, but must show that the adverse action was "motivated at least in part by the plaintiff's protected conduct." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) (citations omitted). If the plaintiff establishes a prima facie case, "the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012)). Once the burden shifts, summary judgment is still appropriate "if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Benison*, 765 F.3d at 658 (quoting *Dye*, 702 F.3d at 294–95). There is no dispute that Gelman's union-organizing activities amount to protected speech and that the plaintiffs' alleged injuries—i.e., Gelman's decreased raise and reduced committee appointments and Lifter's termination—satisfy the adverse-action element. The only issue contested on appeal is whether the plaintiffs have produced an issue of material fact with respect to the third element. As it turns out, however, Lifter's claim suffers a fatal flaw that neither party raises but that dooms her appeal: a lack of standing.

B

Gelman states in his complaint that CSU retaliated against him for exercising his First Amendment rights "by reducing the size of the merit raise to which he was otherwise entitled, by

depriving him of faculty committee appointments, and taking other adverse action against him." Construing the facts in the light most favorable to Gelman, he cannot show that his union-organizing activities were a substantial or motivating factor in these alleged injuries.

Gelman first argues that Boise retaliated against him by failing to appoint him to several law school committees, as Boise had done previously. Pl. Br. at 31. He argues both that his non-appointment is an injury in and of itself, *see Bryson v. Chicago State Univ.*, 96 F.3d 912, 916 (7th Cir. 1996) (holding that "[a] sudden loss of all committee responsibilities . . . would be a loss of tangible employment benefits just as serious as moving an office to an undesirable location, relocating someone's personal files, or isolating the employee from others"), and that his non-appointment affected his merit raise. Gelman points to three specific appointments that he believes Boise denied him on account of his union organizing: the Awards Committee, the Cleveland-Marshall Fund Committee, and his position as a Faculty Advisor to the Journal of Law and Health. Although Gelman was, in fact, denied these appointments in the year following his successful union-organizing campaign, the record does not indicate that they were denied on account of Gelman's protected First Amendment activity.[9] To begin with, Boise appointed many pro-union faculty members to these committees, including a pro-union faculty member who replaced Gelman on the Cleveland-Marshall Fund Committee. In addition, Boise *did* appoint Gelman to a search committee in the spring of 2013, after Gelman had successfully organized the union campaign, and Boise hired the individual that the committee recommended. These facts significantly undermine Gelman's theory that Boise's anti-union animus led him to take the appointment actions against Gelman. Taken in conjunction with Gelman's tepid support for his claim, which consists of nothing more than the temporal proximity between his union organizing

---

[9] We therefore need not decide whether Gelman's lost committee appointments are injuries in and of themselves.

and the loss of his committee appointments, no reasonable juror could conclude that Gelman's lost committee appointments were the result of his union organizing.

Gelman next argues that, notwithstanding his committee appointments, Boise retaliated against him by awarding him only a $666 raise. He advances two related arguments on this point: 1) that his raise of $666 was an intentional invocation of the biblical "mark of the beast" and was intended to punish him and other union organizers; and 2) that under Boise's objective metric, he deserved at least a $3,000 merit raise. Neither argument withstands the defendants' motion for summary judgment.

First, there is no material issue of fact as to how Boise reached the $666 figure. After ranking the law school faculty based on objective, self-reported indices of performance, he divided the faculty into three performance tiers: a $5,000 merit-raise tier, a $3,000 merit-raise tier, and a third "catch-all" tier. After distributing the larger merit raises, Boise divided the remaining merit-raise pool among the third-tier faculty members. Evidence in the record supports Boise's account that, at least initially, third-tier faculty members were supposed to receive $727, a number that has no biblical significance. Only after the merit pool was reduced, and only after Boise made several minor equitable adjustments to the merit-raise distribution,[10] did Gelman receive a raise of $666. Moreover, the $0 and $666 raises fell on pro-union and anti-union faculty members alike, undermining Gelman's claim that the raise amount was specifically chosen to send a message to union organizers.

Second, there is no material issue of fact as to whether Gelman deserved a higher raise under Boise's performance metric. Gelman argues that Boise failed to count two of the three

---

[10] Specifically, Boise reduced one clinical faculty member's raise by 10% and reduced three faculty members' raises to $0. Of the three that Boise reduced to $0, two received an average ranking of zero on Boise's faculty-ranking chart and one had a deficient performance that "nearly resulted in the Legal Aid Clinic she was responsible for administering being removed from Cleveland-Marshall."

articles that had been published or accepted for publication during the relevant time frame, robbing him of merit points that would have placed him in the $3,000 merit-raise tier. Pl. Br. at 13. But it is undisputed that the merit raises were based on scholarship *completed during the past two calendar years*, i.e., 2011 and 2012. Only one of the three articles that Gelman listed was written and published in 2011 and 2012—one of the articles Gelman mentioned was "[p]ublished in 2011, but written earlier," and the other article was listed as "forthcoming, 2013." Gelman argues that Boise's stringent metric—i.e., counting only those articles that were written *and* published during a given timeframe—is discriminatory because some articles would never count towards a professor's merit evaluation. Even assuming this is true,[11] nothing in the record suggests that Boise applied this policy solely to Gelman. On the contrary, the record indicates that Boise applied this policy to all faculty members. A flawed policy, if applied to all evenhandedly, could not permit a reasonable juror to conclude that Boise was specifically targeting Gelman or union supporters for punishment.

The facts of this case are similar to those of *Scott v. Eastman Chem. Co.*, 275 F. App'x 466 (6th Cir. 2008). In *Scott*, we dealt with a sex-discrimination and retaliation claim brought by a female employee who alleged that her employer failed to promote her in favor of promoting a less-qualified male employee. *Id.* at 472–73. The employee also presented evidence showing that, during the time period in question, her employer failed to promote a single female employee to a management position. *Id.* at 469. Her employer responded to the latter claim with evidence showing that promotions were made based on a numeric rating system that graded employees from 1–9 on a range of subjective and objective criteria. *Id.* at 476–77. We held that the

---

[11] It would appear that Boise's metric would still count those articles over time. For example, consider the uncounted article that Gelman listed as "forthcoming, 2013." If Boise's subsequent 2014 faculty-merit evaluation also looked at articles written and published in the previous two years—i.e., 2012 and 2013—then Gelman's 2013 article, if written in 2012, would count in the following year's merit evaluation.

employer's rating system qualified as "a legitimate, non-discriminatory reason" for not promoting her and that "others were promoted ahead of her because they were more qualified, based on criteria which included both an objective as well as a subjective component." *Id.* at 477.

Gelman's situation is similar to the plaintiff's in *Scott*—Boise used a numeric rating system that only used objective criteria. If anything, Gelman's case is weaker than the case we confronted in *Scott* because there the claimant could show that the employer's objective system failed to promote a single member of the protected class during the relevant time period. Here, several pro-union faculty members received substantial merit raises, including one faculty member (Brian Ray) who served as the union's chief negotiator and received the highest possible raise.

Based on the foregoing, there is no issue of material fact as to the motivation behind Gelman's committee appointments or his 2013 merit raise. Therefore, we affirm the district court with respect to Gelman's retaliation claim.

C

Lifter also argues that her termination was retaliation for Gelman's protected First Amendment activity. Although not addressed by the district court and not briefed by either of the parties, our precedent makes clear that Lifter lacks standing to raise a claim for the alleged violation of her husband's constitutional rights.[12]

"Standing is a threshold issue for bringing a claim in federal court and must be present at the time the complaint is filed." *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th

---

[12] At oral argument, Plaintiffs' counsel was questioned by the panel regarding the standing issue. He argued that our decision in *Benison*, 765 F.3d 649, governed and permitted standing. Although that case involved a similar retaliation claim advanced by a married couple, that panel never explicitly addressed standing. The panel instead avoided the issue by referring to the plaintiffs with the collective "they" throughout the opinion. We do not consider their pronoun usage to binding upon us here.

Cir. 2017) (citation omitted). It is well established that federal courts have the power to adjudicate only "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. That jurisdictional limitation requires this court to ensure that the parties before it have "standing," which is loosely defined as a sufficiently strong "'personal stake in the outcome of the controversy' as to . . . justify exercise of the court's remedial powers on [a litigant's] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Although "[a] plaintiff may assert [her] 'own legal rights and interests,'" she may not generally sue to protect the constitutional rights of a third party. *Moody*, 847 F.3d at 402 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)). She may sue where she can prove "(1) injury-in-fact to the plaintiff, (2) a close relationship between the plaintiff and the third party whose rights [she] asserts, and (3) a hindrance preventing the third party from raising [her] own claim." *Moody*, 847 F.3d at 402 (citations omitted). There is little doubt that Lifter can satisfy the first two requirements of third-party standing—her termination certainly qualifies as an injury-in-fact, and her marriage to Gelman satisfies the close-relationship requirement. Where Lifter fails, however, is in demonstrating that Gelman is prevented from raising his own First Amendment claim.

Lifter's failing mirrors that of the plaintiff in our recent decision in *Moody*, 847 F.3d 399. There, a Michigan horse trainer brought a § 1983 suit against the state gaming control board, alleging that he suffered unconstitutional retaliation when he was disqualified from racing on account of his father's legal action against the board. *Id.* at 400–02. We held that Moody could not bring a retaliation suit on the basis of his father's First Amendment rights because nothing hindered his father from litigating his own rights in the first instance. *Id.* at 402–04. This was the case *even though* Moody's father could no longer bring his own First Amendment claim

because of a procedural barrier,[13] and *even though* his father did not have the same incentive to litigate the claim on his behalf. *Id.* at 403. Here, as in *Moody*, Gelman had every opportunity to litigate the alleged violation of his First Amendment rights. His presence as a party in this appeal is a testament to the fact that he did so. Simply because he failed to raise his wife's termination as a component of his own First Amendment retaliation claim in the complaint does not permit Lifter to do so on his account. In order for Lifter to bring a First Amendment claim arising from her termination, she could have asserted that the termination violated *her* First Amendment right to association. *See Sowards v. Loudon Cty.*, 203 F.3d 426, 433 (6th Cir. 2000) (a spouse who alleged that she was fired as a result of her husband's political speech allowed to bring retaliation claim alleging her own First Amendment right to association). At oral argument, Lifter repeatedly stated that she was only asserting her claim through Gelman's First Amendment speech and conceded that "there was no protected activity by Lifter."

Because Lifter lacks third-party standing to raise a First Amendment retaliation claim premised on her husband's constitutional rights, the district court's dismissal of Lifter's termination claim was correct.

### III

For the foregoing reasons, we AFFIRM the district court's dismissal of Gelman's claim and VACATE the grant of summary judgment on Lifter's claim and REMAND with instructions that her claim be dismissed for lack of jurisdiction. Because the plaintiffs' claims fail, the defendants' cross-appeal is moot.

---

[13] Moody's father had filed a motion to amend his complaint to include the claim, but the district court deemed it untimely. *Moody*, 847 F.3d at 403.