**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 11a0303n.06**

**No. 09-4451**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOY MCCOMAS, Individually, and as mother and legal guardian of S.M., a minor, | ) ) ) | **FILED** *May 10, 2011* LEONARD GREEN, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| BOARD OF EDUCATION, ROCK HILL LOCAL SCHOOL DISTRICT; LLOYD EVANS, Superintendent, Rock Hill Local School District, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| Defendants-Appellees, | ) ) | |
| and | ) ) | |
| WILLIAM MACK ANDERSON, | ) ) | |
| Defendant.[1] | ) | |

Before: MERRITT, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. Joy McComas and her daughter, S.M. (collectively, Plaintiffs), sued the Rock Hill School District Board of Education (Board) and Superintendent Lloyd Evans (collectively, Defendants) under 42 U.S.C. § 1983 and state law following an incident in which another student threatened S.M.'s life. The district court granted summary judgment to Defendants. Plaintiffs now appeal, asserting that the district court erred by granting summary judgment on their claims that (1) Evans retaliated against McComas in violation of her First Amendment rights; (2)

---

[1]Defendant Anderson is not a party to this appeal.

the Board retaliated against McComas in violation of her First Amendment rights; (3) Defendants violated Plaintiffs' right to expressive association; (4) Defendants violated McComas's right to petition; and (5) Defendants violated S.M.'s substantive due process rights. We reverse the grant of summary judgment to Evans on McComas's First Amendment retaliation claim and affirm in all other respects.

I.

A. The Knife Incident

This case stems from a dispute between S.M. and her classmate, K.C. Following a confrontation between these two students over romantic notes that one sent to the other's boyfriend, K.C. told S.M.'s friend, J.C., that "she wasn't going to fight [S.M.] without her knife." The next day, K.C. told J.C. that she brought her knife to school and that S.M. "should watch her back." Another student later said that "[K.C.] told alot [sic] of people that she was going to kill [S.M.]." S.M. and J.C. reported these events to the assistant principal.

Though an initial search of K.C.'s belongings did not yield the knife, at least two students reported that K.C. told them that she hid the knife before turning her purse over to administrators. Later that day, S.M.'s boyfriend discovered the knife in K.C.'s purse and gave it to the assistant principal. K.C. then admitted to threatening to use the knife on S.M. and to bringing the knife to school "just like [she] [did] every day." The assistant principal turned the knife over to the authorities. Principal Steven Lambert suspended K.C. for ten days.

When K.C. arrived home, she denied threatening S.M. or taking the knife to school and claimed that school administrators coerced her into signing a false confession. K.C.'s mother admitted that the knife found at school looked like K.C.'s knife. She told Superintendent Evans, however, that K.C. found her knife in her room the next weekend. Following this conversation, Evans told Lambert that they might "not be able to prove that [K.C.] had a knife at school." Evans relayed K.C.'s parents' position to the Board. Upon learning that K.C. recanted her story and that the school might permit K.C. to return, McComas—S.M.'s mother and a teacher at Rock Hill—complained and asked Lambert to investigate further. McComas also expressed her concerns to Evans and the Board via letter.

At the end of her suspension, K.C. returned to Rock Hill for one day and attended classes with S.M. The two did not speak. But, during one shared class, K.C. got up to sharpen her pencil and stared at S.M., leaving her "completely terrorized." S.M. found K.C.'s presence so upsetting that she missed two Ohio Graduation Tests administered that week. McComas again spoke to Lambert about allowing K.C. back at school.

Soon after this incident, McComas appeared before the Board (the March 2007 Board meeting) to argue against K.C.'s permanent return to campus. She read and distributed a prepared statement, explaining that the failure to expel K.C. resulted in anger at S.M. and student speculation that the incident was blown out of proportion. During this meeting, Evans said that he "underst[ood] that [S.M.] initially was the aggressor." K.C.'s parents removed her from school due to headaches and home-schooled her the rest of the year.

B. The Questionnaire

To gather more information for the prosecution, which had charged K.C. with a felony for bringing a weapon to school—a charge of which K.C. was ultimately convicted—McComas created a questionnaire at home. McComas gave S.M. the questionnaire, which S.M. distributed to students at school. The questionnaire asked whether the students had "heard [K.C.] brag about bringing a knife to school," "seen fresh cuts on [her] arms," heard her "talk[] about cutting herself with razors," or "seen her with a razor or knife at school." Upon learning of the questionnaire, Lambert and Evans expressed concern over McComas's involvement and the use of K.C.'s name.

A few weeks later, McComas met with Evans, Lambert, and McComas's union representative (the May 2007 meeting). According to McComas, Evans assumed an "angry, threatening, and intimidating" demeanor. Evans accused McComas of revealing confidential health information about a student via the questionnaire and said she must have accessed K.C's health file. Evans told McComas that "it [was] not [her] job to be the prosecutor," and reiterated "[his] understanding that [S.M.] jumped [K.C.]." Evans said he planned to suspend McComas for three days.

After the meeting, McComas discussed the dispute between S.M. and K.C. in class and informed her students of her suspension. McComas conceded the unprofessional nature of this conversation. Lambert issued McComas a letter of reprimand in connection with her in-class actions. She then received a letter from Evans suspending her pending a disciplinary hearing before the Board (the June 2007 Board meeting). Following this meeting, and pursuant to Evans's

recommendation, the Board rescinded Lambert's earlier reprimand and imposed a ten-day suspension without pay.

C.  The Color-Guard Tryouts

School policy prohibited K.C. (as a long-term home-instruction student) from attending school functions.  But administrators permitted K.C. to return to try out for the field-commander position for the next school year at the same time S.M. would vie for a color-guard spot.  While walking to the gym for her tryout, S.M. came within three feet of K.C. and her parents.  S.M. reported that K.C. "stared at [her] menacingly" and that "[she] was intimidated and terrified and started crying."  S.M. "absolutely fell apart" during her tryout and failed to make the team;  K.C. earned the position of field commander.

The following fall, S.M. overdosed on a prescription drug.  In her suicide note, S.M. "expressed a desire to die because of the breakup with her boyfriend," as well as "ongoing anxiety and fear and a sense of injustice and unfairness that she had felt she had no other option other than to transfer . . . because she did not feel safe attending [R]ock Hill High School where she would not[], she knew, be protected in any way from this student."  When released from the hospital, S.M. began attending South Point High School.

D.  The Ohio Department of Education (ODE) Report

During the next school year, authorities arrested McComas for domestic violence.  According to deposition testimony, Evans raised the possibility of filing an ODE report regarding this incident

to Lambert and provided him with relevant documentation. An outside consultant advised Evans and Lambert to report the incident; the consultant filled out the report himself, and Lambert signed it. A court ultimately acquitted McComas of the domestic violence charge and the ODE took no disciplinary action against her.

II.

We review a district court's grant of summary judgment de novo, affirming if, viewing all of the evidence in favor of the nonmoving party, no genuine issue of material fact exists. *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399 (6th Cir. 2010). In a § 1983 action, the plaintiff must demonstrate the deprivation of a right secured by the Constitution or laws of the United States caused by a person acting under color of state law. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006).

A. First Amendment Retaliation Claim Against Evans

McComas first claims that Evans retaliated against her in violation of her First Amendment rights. To establish this claim, she must show that

(1) [she] was engaged in a constitutionally protected activity;

(2) the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and

> (3) the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585–86 (6th Cir. 2008). "If the plaintiff meets this burden, the burden of production shifts to the defendant, but if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment." *Id*. at 586 (citation omitted).

1. Constitutionally Protected Activities

Because she is a public employee, to establish that her speech enjoyed constitutional protection, McComas must show that (1) her speech involved a "matter[] of public concern"; (2) her interest, as a citizen, in commenting on the matter outweighed "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"; and (3) that she spoke as a citizen rather than "pursuant to [her] official duties." *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337–38 (6th Cir. 2010) (internal quotation marks and citations omitted). We treat "the question of whether, in a First Amendment retaliation action, a public employee's speech is protected as one of law." *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350–51 (6th Cir.), *cert. denied*, 131 S. Ct. 643 (2010).

The Defendants concede that McComas engaged in protected activity when she wrote to Evans and the Board in March 2007, addressed the Board that same month, and filed this lawsuit. The parties only dispute the constitutional protection accorded to McComas for (a) raising concerns to the administration about harassment in the high school; (b) addressing the Board in June 2007;

and (c) preparing the questionnaire. None of these additional activities warrants constitutional protection.

### a. Raising Concerns to the Administration

McComas fails to identify precisely what concerns she raised, when, or to whom she raised them, or to link any alleged adverse action to such vaguely described incidents. We thus deem this argument encompassed by McComas's other specific examples of times she brought her concerns to the administration and find it forfeited as an independent source of constitutionally protected expression. *See United States v. Mobley*, 618 F.3d 539, 550 (6th Cir.) (deeming an issue not fully developed as forfeited), *cert. denied*, 131 S. Ct. 810 (2010).

### b. Addressing the Board in June 2007

In June 2007, McComas addressed the Board "to respond to the charges against [her] as an employee." She read portions of a prepared statement that described the actions she took to prepare for the hearing and noted her previous requests for an investigation of the matter between her daughter and K.C. and demands that the Board follow its policy of expelling students found in possession of a weapon on school property. The Board did not permit McComas to read the portions of her statement that bore on the knife incident or named particular students. She submitted the full text of her prepared statement for the Board's private review.

Neither her speech nor her written statement constitutes constitutionally protected conduct. The meeting served as McComas's suspension hearing, and the speech she delivered concerned her

discipline by her employer—a matter of private, not public, concern. *See Fitzpatrick v. City of Frankfort*, 305 F. App'x 258, 262 (6th Cir. 2008) (noting that speech does not address a matter of public concern when it deals "with internal personnel disputes"). The first half of the written statement, moreover, specifically addresses McComas's employment. The second half concerns events relating to S.M., but appears to serve primarily to explain the background events that prompted McComas's allegedly inappropriate professional conduct—again, not a matter of public concern. *See id.*

### c. Preparing the Questionnaire

McComas asserts that her preparation of the questionnaire constitutes protected activity under both the Free Speech and Petition Clauses of the First Amendment. With respect to McComas's attempt to ground her argument in her right to free speech, we find that she fails to establish that the questionnaire touched on a matter of public concern. Several of the questions relate to the private matter of K.C.'s medical health. *See Lyons v. Sullivan*, 602 F.2d 7, 10 (1st Cir. 1979) (per curiam) ("[S]tatements . . . pertaining to plaintiff's alleged medical condition are not statements on issues of public concern."). In fact, under Ohio law, far from constituting a matter of public concern, such information receives legal protection prohibiting disclosure. *See* Ohio Rev. Code Ann. § 3319.321(B) (protecting from release most personally identifiable student information). McComas argues K.C.'s medical condition "was common knowledge," but cites no authority establishing that distributing well-known student medical information merits constitutional protection. McComas fails, moreover, in light of the sensitive medical information highlighted in the questionnaire, to

convince us that her interest in this speech outweighs the school's interest in regulating it to protect a student. *See Barr v. Lafon*, 538 F.3d 554, 567–68 (6th Cir. 2008) (recognizing the competing rights of expression and "rights of other students to be secure and to be let alone" (internal quotation marks and citation omitted)).

McComas fares no better when grounding her argument on her right to petition. McComas submits the questionnaire as the "petition," claiming that she prepared it to assist in prosecuting K.C. As discussed above, though, the questionnaire did not touch on a matter of public concern and thus lacks protection. *See Jenkins*, 513 F.3d at 587 n.2 ("[T]he public concern test applies to petitioning activity for public employees."). And, although "[t]he plain language of the First Amendment makes clear that a 'petition' triggers the amendment's protections," *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) (internal quotation marks and citation omitted), McComas fails to establish that the questionnaire so qualifies. At the time McComas prepared the document, the prosecutor's office had already initiated K.C.'s prosecution. McComas thus did not issue the questionnaire to air a grievance or to spur the government to take any particular action. *See id*. We thus find that creating and distributing the questionnaire did not constitute protected activity for McComas's retaliation claim.

2. Adverse Action / Motivation

With respect to McComas's activities that the parties agree constitute protected conduct—writing to Evans and the Board in March 2007, addressing the Board that same month, and filing this lawsuit—we next consider whether McComas suffered "an adverse action that would deter

a person of ordinary firmness from continuing to engage in that conduct." *Id.* at 524 (internal quotation marks and citation omitted). In addition, McComas must show that her protected conduct "was a substantial or motivating factor" of the retaliatory action. *Rondigo, L.L.C. v. Casco Twp.*, 330 F. App'x 511, 523 (6th Cir. 2009) (internal quotation marks and citation omitted).

### a. McComas's Suspension

McComas first argues that Evans suspended her in retaliation for her protected activity. Evans attributed the suspension to McComas's preparing and distributing the questionnaire without approval, "involving students in a discussion concerning Rock Hill and (two) particular students" after being warned not to do so, and failing to perform "teaching duties in a professional manner by being involved in other matters."

The district court correctly evaluated Evans's first two rationales for suspending McComas as not implicating protected conduct; it overlooked, however, Evans's reference to "other matters" as a basis for McComas's suspension. When asked what "other matters" meant, Evans initially explained that "[McComas's] involvement in the investigation and on-going did take class time throughout this period of time." When asked specifically whether these "other matters" referred only to the questionnaire and McComas's in-class discussion of the knife incident, Evans said that he thought "there [were] probably also other kind[s] of things going on." We agree with McComas that this evidence supports her argument that a genuine issue of material fact exists regarding whether Evans's motivation included McComas's March 2007 letter or address to the Board, both of which the Defendants concede constitute protected conduct.

b. ODE Report

McComas next argues that Evans retaliated against her when he ordered Lambert to report her domestic violence charge to the ODE. The district court concluded that she suffered no adverse action because public records documented the arrest, the report did not include any inaccurate or misleading information, and the ensuing ODE investigation did not result in any punitive action.

We see this too as falling short of the summary judgment standard. Administrators—who had no obligation to do so—submitted the report to an organization with the power to conduct hearings and to remove a teacher's certification. Lambert conceded that he expected McComas "would be upset" by the filing of the report, and Evans testified that a report to the ODE "[c]ertainly" qualifies as a very serious matter for a teacher. As a result of the ODE report, moreover, McComas incurred additional attorney expenses. Submitting this report thus does not constitute the sort of "inconsequential action[]" subject to summary judgment. *See Holzemer*, 621 F.3d at 524 (internal quotation marks and citation omitted). McComas, moreover, produced evidence that her protected conduct "was a substantial or motivating factor" of the retaliatory action. *See Rondigo*, 330 F. App'x at 523 (internal quotation marks and citation omitted). According to Lambert, "there[] [was] some discussion" about the lawsuit amongst the group deciding whether to file the report. And McComas attested that, when she confronted Lambert about the report, he said, "Well, you are suing [or are in a lawsuit with] the Board."

Evans disputes liability by claiming he did not actually cause the adverse action, which he characterizes as solely Lambert's doing. The record suggests otherwise. Lambert first learned of

McComas's charge and the possibility of filing an ODE report upon talking to Evans. Evans concedes that he gave Lambert a copy of the restraining order against McComas that Lambert ultimately submitted to the ODE, and that he told Lambert that the document could be part of the case. According to Lambert, Evans said that "school officials could—if they don't report misconduct, they could have their certificate[s] pulled." Though Evans denied making such a statement—and a consultant advised the two that they should report the incident—we believe that, viewing the evidence in the light most favorable to Plaintiffs, a genuine issue of material fact exists regarding Evans's responsibility for the ODE report.

### c. Characterizing S.M. as the Initial Aggressor

McComas did not raise Evans's characterization of S.M. as the initial aggressor during the March 2007 Board meeting as a potential adverse action before the district court, and we thus need not consider it here. *See United States v. Ninety-Three (93) Firearms*, 330 F.3d 414, 424 (6th Cir. 2003). Evans's statement, nevertheless, is not sufficiently embarrassing to constitute an adverse action. *Compare Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 727 (6th Cir. 2010) (finding that defendant's statements that there was a neighborhood petition against plaintiff and that plaintiff violated township ordinances did not constitute adverse action), *with Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998) (finding adverse action where defendant publicly released "irrelevant, humiliating, and confidential information" concerning "the private details of [a] rape").

### d. Bullying and Intimidating McComas

In support of her claim that Evans bullied and intimidated her in his office, McComas pinpoints only one particular statement: "Why do you think you should investigate this[?] . . . Are you trying to be the prosecutor[?]  You have no reason to do this."  Evans's statement refers to McComas's creation of the questionnaire, which, as discussed above, does not constitute protected conduct, ending this inquiry.  *See Fox*, 605 F.3d at 351.

### e. Not Expelling K.C.

Finally, McComas fails to establish that Evans decided not to expel K.C. and to allow her to return to school grounds in retaliation for McComas's protected conduct.  She posits only that "Evans had political associations and friendships at stake," "he maintained close interactions with K.C.'s family," and that, "to protect the aforementioned friendships and associations, Evans retaliated against [her]."  But deposition testimony reveals that Evans considered only permissible factors in determining whether to expel K.C.  Evans testified that he did not expel her because, once K.C. rescinded her confession, he had doubts about whether she brought the knife to school.  K.C., moreover, appeared on school grounds on only two occasions during the school year after the knife incident—for one day following her ten-day suspension and for field-commander tryouts.  With respect to the field-commander tryouts, in accordance with past practice, administrators permitted K.C.'s brief return because doing so would allow her to participate in the activity during the next academic year.  No evidence suggests that they did so in response to any protected conduct, rendering summary judgment appropriate.

B.  First Amendment Retaliation Claim Against the Board

As to the Board, McComas first claims that it "rubber-stamped" Evans's disciplinary recommendation in retaliation for her protected conduct.  Following a hearing, the Board suspended McComas for ten days "for insubordination" and directed her "to comply with Ohio and Federal law regarding the duty of school employees not to release personally identifiable student information." The Board's reasoning refers exclusively to the unprotected questionnaire incident and the admittedly improper in-class discussion.  McComas thus lacks evidence that the Board took any unconstitutional action.  *See Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) ("A governmental entity . . . can be held liable under § 1983 only if a plaintiff establishes an unconstitutional action that implements or executes a . . . decision officially adopted and promulgated by that body's officers."  (internal quotation marks and citation omitted)).

McComas also seeks to fault the Board for failing to investigate Plaintiffs' complaints.  But McComas offers no evidence that the Board had a constitutional duty to investigate McComas's or S.M.'s claims, *see id.*, or that the Board had a "clear and persistent pattern" of failing to investigate such claims, *see Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005) (explaining standard for establishing a § 1983 claim based on a failure to act).  To the extent that McComas attempts to hold the Board liable based on Evans's actions, this claim also fails.  *See Jenkins*, 513 F.3d at 589 ("[T]here is no respondeat superior liability in actions under § 1983 . . . .").

C.  Plaintiffs' Right to Expressive Association and McComas's Right to Petition

Plaintiffs next press us to find that, based on the questionnaire incident, the Defendants violated their right to expressive association and McComas's right to petition. But, as discussed above, the creation and distribution of this questionnaire—in the school setting—gets no constitutional protection. Without protected conduct, Plaintiffs' claims fail. *See Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) (recognizing right to expressive association to engage in activities protected by the First Amendment); *Holzemer*, 621 F.3d at 520 (noting that "whether the plaintiff's conduct deserves constitutional protection" serves as the "threshold question" for right-to-petition claims (internal quotation marks and citation omitted)).

D.  S.M.'s Substantive Due Process Rights

Finally, S.M. claims that the Defendants violated her substantive due process rights in constructively expelling her. "Interests protected by substantive due process . . . include those protected by specific constitutional guarantees, . . . freedom from government actions that shock the conscience, and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003) (internal quotation marks and citation omitted).

S.M. claims her "constructive expulsion" from Rock Hill deprived her of a fundamental right. As an initial matter, we did not—as S.M. claims—recognize constructive expulsion as a cause of action in *Salehpour v. University of Tennessee*. 159 F.3d 199, 207 (6th Cir. 1998) (noting merely

that, "to the extent that one could argue that Plaintiff may have been 'constructively' expelled, we believe that Defendants more than afforded Plaintiff his procedural process rights"). Nor need we now determine whether to do so. Before the district court, S.M. attempted to establish a substantive due process violation by tying such constructive expulsion to her right to travel and her rights to intimate and expressive association. Here she does not. Thus, even if she did suffer constructive expulsion, S.M. fails to identify any fundamental right thereby impaired. *See Bell*, 351 F.3d at 250.

III.

For the above reasons, we reverse the grant of summary judgment to Evans on McComas's First Amendment retaliation claim, and affirm the district court judgment in all other respects.