NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0424n.06

No. 24-1842

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Sep 16, 2025
KELLY L. STEPHENS, Clerk

SANDRA HERNDEN,

    Plaintiff-Appellant,

v.

CHIPPEWA VALLEY SCHOOL DISTRICT, et al.,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: CLAY, KETHLEDGE, and STRANCH, Circuit Judges.

CLAY, J., delivered the opinion of the court in which STRANCH, J., concurred. KETHLEDGE, J. (pp. 15–17), delivered a separate opinion concurring in the judgment.

**CLAY, Circuit Judge.** Plaintiff Sandra Hernden brings this 42 U.S.C. § 1983 action and First Amendment retaliation claim against the Chippewa Valley School District and two of its board members, Frank Bednard and Elizabeth Pyden, for whom the district court granted summary judgment. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Plaintiff Sandra Hernden was a police officer at the City of Harper Woods Police Department who had children attending school in the Chippewa Valley School District. Hernden was also a member of "Moms for Liberty,"[1] an organization of mothers who appeared at school

---

[1] Defendants' brief describes "Moms for Liberty" as an "extremist" organization, according to the Southern Poverty Law Center. Appellees' Br., ECF No. 22, 6.

board meetings to advocate for in-person schooling during the COVID-19 pandemic. Hernden Dep., R. 25-2, Page ID #351. Hernden attended these meetings at the Chippewa Valley School District and had "heated" interactions with members of the School Board, particularly Defendant Elizabeth Pyden, about the District's handling of the pandemic. Compl., R. 1, Page ID #4. Hernden also sent aggressive and politically charged emails to the Board about the efficacy of hybrid learning.[2]

Pyden testified that Hernden "publicly defamed" her at board meetings and encouraged others to disparage her online, posting "hateful messages about [her] age, appearance, and family." Pyden Aff., R. 25-3, Page ID #384–85. Among other behaviors, Hernden revealed Pyden's personal information on online forums, such as her home address and phone number, which resulted in "occupied cars parked in front of [Pyden's] home," the receipt of "Nazi cartoons" in Pyden's mail, and "telephone calls and messages . . . indicating that [Pyden] should kill [herself]." *Id.* at 384. Hernden also sent messages to the Board and community demanding that "action" be taken against Pyden. *Id.* at 385.

On December 10, 2020, Pyden "exchanged several emails with [Hernden] regarding the global pandemic, face-to-face learning, and Board action related to such topics." *Id.* Hernden "proceeded to issue a series of personal attacks" against Pyden. *Id.* On December 11, 2020, this culminated in Pyden forwarding the email chain from her personal email to Chief Vince Smith, who was Hernden's then-supervisor at the Harper Woods Police Department ("Harper Woods" or "the Department"). The email read:

---

[2] Because of the COVID-19 pandemic, many elementary and secondary schools transitioned to a hybrid learning format consisting of a mixture of virtual and in-person learning.

> Dear Chief Smith:
>
> I am writing with a concern regarding how one of your officers conducts herself in her own community. As you know, return to school has been a hotly contested issue, however, we must do what is best for the community at large. I have noticed that in fact your city hall has closed indefinitely to assist in stopping the community spread. As an elected official, I do expect criticism. I also expect people to disagree with me. However, I do not expect the level of disrespect, even after being asked to stop, that has been shown by one of your public safety officers, Sandra Hernden. As a public servant, more is expected. I do not believe that you would like anyone expressing this level of anger, disrespect and veiled racism in your community. I have attached the exchange below. There have also been calls into our meeting, although I do believe there may have been some connection issues. I am disappointed that this type of behavior has been repeatedly rewarded with service awards. While I do not expect you to take any adverse action, I do believe that it is important for you to know how one of your officers is conducting herself within the community and perhaps offer some guidance.
>
> Thank you for your attention to this matter. May you and your family have a blessed holiday season.
>
> Elizabeth Pyden

Pyden Email, R. 1-2, Page ID #16. As result of this email, Chief Smith spoke to Hernden and advised her that she would not be disciplined by the Police Department. While there had been a "brief" investigation due to Pyden's email, it had not uncovered anything, and Hernden only became aware of it after being told that she did not violate any department policy. Hernden Dep., 25-2, Page ID #331. Hernden experienced no monetary or emotional damages because of the email. Admittedly, Hernden "was undeterred" by Pyden's email and "continued to advocate for a return to in-person learning." Appellant Br., ECF No. 16, 7.

On September 13, 2021, Hernden participated in public comment at a school board meeting. Defendant Frank Bednard, Board President and a retired police officer, observed that Hernden's demeanor was "much more serious than when normally addressing the Board," and that "[s]he seemed very angry and very agitated." Bednard Aff., R. 25-4, Page ID #389. Hernden's public comment "began with a history of the publication of Adolf Hitler's *Mein Kampf* and a

description of how Nazi Germany labeled Jewish individuals with 'yellow badges.'" *Id.* Because these comments "went on for some time and appeared to be irrelevant to District matters, [Bednard] attempted to direct [Hernden] to explain how this commentary related to the District." *Id.* at Page ID #390. Hernden proceeded to "tell[] a story about a family member." *Id.* When Bednard again attempted to direct Hernden to address District matters, "she yelled several times in response that she was getting to her point." *Id.* Hernden then compared the Board's pandemic mask-policy to Nazi Germany. Bednard testified that, as a retired police officer with "30 years of experience and training in reading an individual's behavior," Hernden's "aggressive behavior shocked and scared [him]." *Id.*

On October 4, 2021, United States Attorney General Merrick Garland issued a memorandum to address threats against school administrators, board members, and other educators. Bednard viewed an ABC News report on the memorandum, "which reported that anyone could refer abusive, intimidating, or threatening behaviors at Board meetings to the Department of Justice ('DOJ')." *Id.* That same day, Hernden sent an email to the District with the subject line, "Special attention to Frank [Bednard]" with a link to a recent Sixth Circuit decision "concerning public commentary at school board meetings." *Id.* Hernden's email read: "Once again, law on parents [*sic*] side. Maybe a lil [*sic*] more due care and caution at the next meeting Frank. You know, when you let your hatred you have for me take hold and you interrupt me. 1st 2 were free. . ." Compl., R. 1, Page ID #8.

In light of Hernden's "escalating aggressive behavior at Board meetings," Bednard found this email threatening, and transmitted a copy of it to the DOJ on October 5, 2021. Bednard Aff., R. 25-4, Page ID #391. Bednard also sent the following message describing Hernden's conduct at board meetings:

> Hello DOJ,
>
> I appreciate your looking into these groups of people who bring such threats to anybody that stands in their way. The email I included below is from Sandra Hernden. This woman, Sandra Hernden, comes to every meeting to harass our board, administration, and community who oppose her views. She is over dramatic, and refuses to listen to any direction I may give her about her inappropriate and threatening comments. Last week she compared the tattoos Nazi Germany gave Jewish people to identify them in WW2 to [the] Masking mandate of today (even though mask[s] are not mandated in our district). We understand that Sandra has no children in our schools, is not a resident of our district, and goes around to school board meetings throughout the tri county area to promote her agenda in any way that she can including threats and intimidation. She is part of a group called, "Mothers of Liberty" that attend our meetings. This group of people attend every meeting, and because their threats and demeanor are so intimidating, no community members who oppose their message will come to the meeting to speak because they are afraid of what this group would do to them for standing up to them.
>
> Our school district has over 15,000 students. We know that they have not gained any traction as it is the same 10-15 people that show up every meeting to intimidate, threaten, and harass. Anything that could be done to curb this behavior by these people would be greatly appreciated by our board, administration, and our community.
>
> Thank you!

Compl., R. 1-3, Page ID #26. Hernden was not aware of Bednard's communication with the DOJ until a friend later informed her about it. She further acknowledged that the DOJ took no action in response to Bednard's email and did not contact her in any manner. After the email was sent, Hernden continued to appear at school board meetings in October 2021 and April 2022.

On September 29, 2022, Plaintiff Hernden filed a First Amendment retaliation lawsuit against the District, Bednard, and Pyden ("Defendants") pursuant to 42 U.S.C. § 1983. Hernden viewed the emails of Pyden and Bednard as retaliatory actions meant to curb her speech at school board meetings. On March 27, 2023, Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(c), arguing that "Plaintiff made no factual allegations against the Board/District itself." Defs.'s Mot. to Dismiss, R. 17, Page ID #137. The district court granted Defendants' motion in part and denied it in part, holding that Pyden's email could not satisfy the

requirements for municipal liability under *Monell v. Department of Social Services*, but that discovery was needed to ascertain whether the District was responsible for Bednard's email to the DOJ. 436 U.S. 658 (1978). Plaintiff and Defendants then filed opposing Motions for Summary Judgment. The district court granted Defendants' Motion in full and denied Plaintiff's Motion in full, holding that Plaintiff did not suffer an adverse action that would deter a person of ordinary firmness from engaging in protected speech. Because the district court found no constitutional violation, it did not discuss whether Defendants were entitled to qualified immunity. This appeal followed.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo*. *Kubala v. Smith*, 984 F.3d 1132, 1137 (6th Cir. 2021) (quoting *Jones v. Clark Cnty.*, 959 F.3d 748, 756 (6th Cir. 2020)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). Moreover, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

### A. Summary Judgment as to Defendant Pyden

Plaintiff Hernden argues that Pyden's email to Chief Smith, her supervisor, was an adverse action sufficient to "deter a person of ordinary firmness from engaging in conduct protected by the First Amendment." Appellant Br., ECF No. 16, 13. Hernden claims that it is irrelevant that she kept her job and suffered no compensatory damages as result of the email. She further states that

although Pyden's email "expressly disclaims the desire that [Hernden] face an adverse employment action [as result of her speech at the school board meetings], a reasonable jury could nevertheless conclude that an adverse action was reasonably foreseeable." *Id.* at 17. To bolster this argument, Hernden cites Pyden's written accusation that she was a "veiled racis[t]," and that this comment served to threaten her livelihood as a police officer following the recent death of George Floyd.[3] *Id.* at 18–19. Defendants argue that "mere complaints to a citizen's employer" do not constitute an adverse action, Appellees' Br., ECF No. 22, 21, and that Pyden was merely exercising her own First Amendment rights by revealing true information about Hernden's speech and conduct to her employer.

To succeed on her First Amendment retaliation claim, Hernden must establish the following three elements:

> (1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

*Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). There is no doubt that Hernden's speech at the school board meetings was a constitutionally protected activity under element one of her claim. *Paige v. Coyner*, 614 F.3d 273, 280–81 (6th Cir. 2010). Whether Pyden's email constituted an adverse action or credible threat to Hernden's employment with the Department, as required to satisfy element two, is a closer issue.

---

[3] Plaintiff notes that George Floyd was killed on May 25, 2020, by three Minneapolis Police Officers. Appellant Br., ECF No. 16, 18–19. Floyd was an African American, and his death has often been characterized as a racially motivated instance of police brutality. *See id.* (citing *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd*, U.S. Department of Justice, (Feb. 24, 2022), https://www.justice.gov/archives/opa/pr/three-former-minneapolis-police-officers-convicted-federal-civil-rights-violations-death.).

But we need not reach the second or third elements of Hernden's First Amendment retaliation claim with respect to Defendant Pyden, because under *Mackey v. Rising*, Pyden had no actual authority to speak for the Board in her communication to Chief Smith. 106 F.4th 552, 559 (6th Cir. 2024).

"An act is not attributable to a State unless it is traceable to the State's power or authority. Private action—no matter how 'official' it looks—lacks the necessary lineage." *Lindke v. Freed*, 601 U.S. 187, 198 (2024). In the First Amendment context, "'the controlling issue' [is] whether an official 'possessed state authority' to take the action 'and whether [they] purported to act under that authority' on the specific occasion." *Mackey*, 106 F.4th at 559 (quoting *Dean v. Byerly*, 354 F.3d 540, 553 (6th Cir. 2004)). A state official does not possess the actual authority to take a challenged action on behalf of the state unless that action "meaningfully relates to [their] 'governmental status' or the 'performance of [their] duties.'" *Id.* at 559 (quoting *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001)). In *Mackey*, we addressed this issue when the plaintiff, Shane Mackey, brought a § 1983 claim against City Commissioner, Jeff Rising, for violating his First Amendment rights after Rising made a phone call threatening to physically "hurt" Mackey if he did not remove a social media post. *Id.* at 554–55. We determined that the alleged threat did not constitute the "type of authority" vested in City Commissioners such as Rising who perform mostly legislative duties, because "[u]nlike police officers, legislators generally lack the power to wield the State's monopoly on the use of force," meaning that "Rising lacked any power to make this type of threat on the City's behalf." *Id.* at 562.

Likewise, Hernden has not demonstrated how Pyden possessed any actual authority to speak on behalf of Chippewa Valley Schools when she wrote the email to Chief Smith complaining of Hernden's behavior. As a member of the Board, Pyden assists in policymaking on behalf of the

school district but ostensibly has no authority or control over employment decisions being made at the Harper Woods Police Department. And Hernden points to no "statute, ordinance, regulation, custom, or usage" granting Pyden this power in her capacity as a state official. *Id.* at 559. The Board's official bylaws do not authorize individual Board members such as Pyden to speak for the Board except as it pertains to "public statements on school matters," and only on certain occasions. Policy Manual for Chippewa Valleys Schools, R. 24-9, Page ID #278 (specifying that individual Board members may only deliver these public statements "[f]rom time-to-time"). Pyden's private email to Chief Smith hardly qualifies as a "public statement." *Id.*

Furthermore, Pyden sent the email to Chief Smith using her *private email account* and did not advise the Board of her intent to send the email, and the Board "never ratified nor adopted" the email in any way. Pyden Aff., R. 25-3, Page ID #386. Without any indication that Pyden was authorized to act as an official mouthpiece for the Board under these circumstances, she cannot simply "conjure the power of the State through [her] own efforts" as a private citizen. *Mackey*, 106 F.4th at 563. This ends the inquiry on Defendant Pyden.

### B. Summary Judgment as to Defendant Bednard

Plaintiff Hernden also argues that Bednard's email referral to the DOJ was an adverse action because it placed her under "threat of a specific future harm." Appellant Br., ECF No. 16, 26 (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019)). In particular, she claims that the Attorney General's memorandum on prosecuting domestic terrorism caused her to "face[] a distinct and cognizable fear of an investigation by the DOJ," *id.* at 29, and that "[a] person of reasonable firmness would have been chilled by [Bednard's email to the DOJ] in light of the imminent exposure to criminal liability it created." *Id.* at 30. Defendants respond that Bednard's email, at most, caused a "subjective chilling" of Hernden's First Amendment rights and did not

rise to the level of an adverse action. Appellees' Br., ECF No. 22, 24 (citing *Laird v. Tatum*, 408 U.S. 1 (1972)).

As an initial matter, Bednard's authority to speak for the Board is far more robust than Pyden's. The Board's official bylaws provide that Bednard, as Board President, always "functions as the official spokesperson for the Board," whereas "individual Board members" such as Pyden may *sometimes* "make public statements on school matters." Policy Manual for Chippewa Valley Schools, R. 24-9, Page ID #278. Accordingly, Bednard was expressly empowered to speak on behalf of the Chippewa Valley Schools Board of Education when he emailed the DOJ about Hernden's disruptive behavior on October 5, 2021, and *Mackey*'s state action requirement is satisfied. 106 F.4th at 559.

Having established state action, we now move to the merits of Hernden's claim. For First Amendment retaliation purposes, an adverse action is one that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Josephson v. Ganzel*, 115 F.4th 771, 787 (6th Cir. 2024) (quoting *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014)). This analysis "must be tailored to the circumstances," and recognizes that public employees, such as police officers, "might have to endure more than the average citizen." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). To be actionable, an adverse action must generate more than "de minimis negative consequences." *Kubala*, 984 F.3d at 1139. Inconsequential actions are thus "properly dismissed as a matter of law." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012); *see Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005) ("[S]ince § 1983 is a tort statute, we must be careful to ensure that real injury is involved, lest we 'trivialize the First Amendment' by sanctioning a retaliation claim even if it is unlikely that the exercise of First

Amendment rights was actually deterred." (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (en banc))).

Traditionally, the term "adverse action" has arisen from the employment context, and refers to "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Kubala*, 984 F.3d at 1140 (quoting *Thaddeus-X*, 175 F.3d at 396). An employer need not discharge an employee for them to show that an adverse action occurred. *Id.* at 1139. That said, "[m]ost of the relevant Supreme Court and Sixth Circuit cases concern actual retaliation, *not threats of retaliation*, and firings constitute the bulk of the cases." *Id.* at 1140 (emphasis added).

In some cases, "threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected [speech]." *Id.* (quoting *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010)). This includes "credible threat[s]" made to one's economic livelihood, "[s]ince few aspects of one's life are more important than gainful employment." *Fritz*, 592 F.3d at 728; *see Paige*, 614 F.3d at 281 ("Losing one's job and accompanying benefits is certainly severe enough to deter a person of ordinary firmness from speaking at public meetings." (citing *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008)). "[A] credible threat to the nature and existence of one's ongoing employment is of a similar character to the other recognized forms of adverse action—termination, refusal to hire, etc.—even if perpetrated by a third party who is not the employer." *Fritz*, 592 F.3d at 728.

Less commonly, an adverse action may also arise from conduct that creates a credible threat of criminal prosecution. While this nature of threat may "significantly heighten[] the risk of chilled expression," there must still be a specific objective harm. *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1025 (6th Cir. 2024); *Schlissel*, 939 F.3d at 764. This means "something more than 'the individual's knowledge that a governmental agency was engaged in certain

activities or . . . the individual's concomitant fear that . . . the agency might in the future take some other and additional action detrimental to that individual.'" *Schlissel*, 939 F.3d at 764 (quoting *Laird*, 408 U.S. at 11). When there is no objective chill to one's speech, allegations of a speculative or subjective harm do not establish a First Amendment retaliation claim. *Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 (6th Cir. 1983). It is likewise insufficient to allege "the mere existence, *without more*, of a governmental investigative and data-gathering activity." *Schlissel*, 939 F.3d at 764 (quoting *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 608 (6th Cir. 2008)). Governmental activity only constitutes an injury-in-fact when it is "regulatory, proscriptive, or compulsory in nature, and the complainant is either presently or prospectively subject to the regulations, proscriptions, or compulsions that he is challenging." *Id.* at 764–65 (quoting *Laird*, 408 U.S. at 11) (cleaned up).

For example, we found no adverse action in a state investigation where the plaintiff alleged no injury besides emotional damages. *Wurzelbacher*, 675 F.3d at 584. In *Wurzelbacher*, the plaintiff was a private citizen and Ohio resident who made several public criticisms of former-President Barack Obama during his 2008 campaign. *Id.* at 581–82. These comments were widely publicized and led state officials to authorize a search of the plaintiff on several state databases; however, the plaintiff's complaint did not allege what information, if any, was actually uncovered. *Id.* at 584. Because the plaintiff suffered no specific or concrete injury, and "was not threatened with a continuing governmental investigation," *id.* at 584, we held that any adverse action was "'inconsequential' as a matter of law." *Id.* at 585 (quoting *McComas v. Bd. of Educ., Rock Hill Local Sch. Dist.*, 422 F. App'x 462, 469 (6th Cir. 2011)). This was true despite the plaintiff's allegations that he suffered "emotional distress, harassment, personal humiliation, and embarrassment." *Id.* at 584.

Here, by contrast, there is no evidence that Hernden was ever subjected to a governmental investigation. Her claim is instead rooted in her *fear of an investigation*, even though Defendant Bednard had no control over the actions of the DOJ and Hernden herself acknowledges that the DOJ did not attempt to contact or communicate with her in any way as result of Bednard's email referral. Hernden further admits that she is unaware of any action undertaken by the DOJ or if "anything ever came of [the] email." Hernden Dep., R. 25-2, Page ID #350. In her deposition, when Hernden was asked about "what impact, if any," the email had on her life, she answered: "None." *Id.*

Hernden has thus not shown that Bednard's email to the DOJ violated any clearly established law under these circumstances, where she does not allege even a single tangible consequence of Bednard's email, and nothing else in the record plausibly suggests a threat of any future specific harm. *Wurzelbacher*, 675 F.3d at 584–85; *see also Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999) (rejecting a First Amendment retaliation claim when the plaintiff failed to "concretize her personal injury").

Hernden nonetheless argues that Bednard's email subjected her "to the possibility of a prospective criminal investigation" in light of the Attorney General's recent memorandum urging school boards to report harassment to the DOJ, and that this fear of punishment objectively chilled her speech.[4] Appellant Br., ECF No. 16, 24. But Hernden has not explained how her speech could

---

[4] Plaintiff Hernden seeks to rely on *Schlissel* to argue that reporting one's conduct to law enforcement objectively chills speech due to the fear of future punishment; however, *Schlissel* is distinguishable from the present matter. In *Schlissel*, we held that an advocacy organization had standing to sue the University of Michigan because the school's initiative for filing conduct reports ("bias incidents") included the ability to refer reported conduct to the authorities, thus chilling student speech. 939 F.3d at 765. But the plaintiffs in *Schlissel* brought a facial challenge to the University's definitions of harassment and bullying, 939 F.3d at 761, as opposed to Hernden's as-applied First Amendment challenge. *Schlissel* also does not concern a First Amendment retaliation claim, as Hernden alleges here, or what constitutes an adverse action in that limited context.

be chilled when she had no knowledge of Bednard's email to the DOJ until a friend later informed her of its existence. *See Wells v. Rice*, 692 F. Supp. 3d 735, 746 (E.D. Ky. 2023) ("An injury of which [a party is] not even aware cannot deter them and thus cannot support a [First Amendment] retaliation claim."). She has likewise not pointed us to any law that would have provided Bednard with "fair warning" that his email to the DOJ could be unconstitutional, *MacIntosh v. Clous*, 69 F.4th 309, 319 (6th Cir. 2023) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)), especially in light of the Attorney General's recent memorandum urging school board members, such as Bednard, to report instances of harassment.

Hernden further admits that, even after she learned of Bednard's email to the DOJ, "[s]he had no way to know whether this prospective criminal investigation could, or would, become actualized into a current investigation." Appellant Br., ECF No. 16, 25. Without the slightest indication that the DOJ was pursuing an investigation of Hernden or even considering doing so, her alleged fear of an investigation is too speculative. *Schlissel*, 939 F.3d at 764. She has not identified any clearly established law to suggest otherwise.

Accordingly, the district court did not err in granting Defendants' Motion for Summary Judgment.[5]

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

[5] Because the record demonstrates no clearly established constitutional violation, the District is also entitled to summary judgment on Plaintiff Hernden's *Monell* claim. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation . . . .").

KETHLEDGE, Circuit Judge, concurring in the judgment.  I agree that the district court correctly granted summary judgment to the defendants.  But my reasons for that conclusion differ in some respects from the majority's, so I concur only in the judgment.

As an initial matter, I think that a reasonable jury could find that the emails sent by board secretary Elizabeth Pyden and board president Frank Bednard, respectively, were adverse actions for purposes of her First Amendment claim.  Pyden emailed Hernden's boss—Harper Woods Chief of Police Vince Smith—to say (of Hernden) that "I do not believe you would like anyone expressing this level of anger, disrespect and veiled racism in your community."  True, Pyden added that, "[w]hile I do not expect you to take any adverse action, I do believe that it is important for you to know how one of your officers is conducting herself withing the community and perhaps offer some guidance."  But the question whether to take that disclaimer at face value, in my view, was one for the jury to answer—particularly given the charge of "veiled racism," and that Pyden chose to send this email to—of all people—the one person with authority to fire Hernden.  A reasonable jury could find that a person of "ordinary firmness" would have been chilled by news of that email.  *See Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583-84 (6th Cir. 2012).

The same is true of Bednard's email to the Attorney General Garland, just one day after he announced the FBI's willingness to investigate people who make threats at school-board meetings and to "prosecute them when appropriate."  Threatening behavior is exactly what Bednard complained about in his email; and Bednard ended the email by asking the Attorney General—the Nation's highest law-enforcement officer—to do "anything that could be done to curb [Hernden's] behavior."  And just about the only thing that the Attorney General could have "done" in response to Bednard's request would have been to commence or threaten some kind of legal (possibly

criminal) action against Hernden. Thus a jury could find that a person of ordinary firmness would be chilled by news of that email too.

Yet I agree with my colleagues that both defendants were entitled to summary judgment. Pyden patently was not a state actor when she sent her email to Chief Smith, because she lacked authority to speak for the Board. *See Mackey v. Rising*, 106 F.4th 552, 559 (6th Cir. 2024) (citation omitted). Hernden all but concedes the point. *See* Reply Br. 13; Oral Arg. 6:15-6:45. Pyden's email was personal, not official—which means she cannot be liable for it under § 1983. *Lindke v. Freed*, 601 U.S. 187, 199-201 (2024).

Meanwhile, Bednard is entitled to qualified immunity unless Hernden has shown that the existing caselaw would have made clear to Bednard that his email would violate her constitutional rights. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That email complained mostly about Hernden's allegedly threatening behavior, rather than her speech: he said Hernden had been "harass[ing] our board, administration and community who oppose her views," engaging in "threats and intimidation," and was part of a group whose "behavior [is] so intimidating, no community members who oppose their message will come to the meeting to speak up because they are afraid of what this group would do to them." Bednard's complaints were not baseless: the day before, for example, Hernden had emailed him the following: "Maybe a lil more due care and caution at the next meeting Frank. You know, when you let your hatred you have for me take hold and you interrupt me. 1st two were free. . ." Even Hernden concedes that this email made a threat that aimed to change Bednard's behavior. True, Bednard's email also mentioned Hernden's speech—such as her comparison of the school board's policies to those of Nazi Germany. And that speech was protected by the First Amendment. *See National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977). But the bulk of Bednard's complaints were about her alleged

- 16 -

threats, intimidation, and harassment—which the First Amendment would not protect. And Hernden has not identified any case that would have made clear to Bednard that this complaint, about this behavior, would have violated her First Amendment rights. I therefore agree with my colleagues that he was entitled to summary judgment as well.